16-1449

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SONIX TECHNOLOGY CO., LTD.,

Plaintiff-Appellant

v.

PUBLICATIONS INTERNATIONAL, LTD., SD-X INTERACTIVE, INC.,
ENCYCLOPEDIA BRITTANNICA, INC., HERFF JONES INC.,

Defendants-Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS IN 1:13-cv-02082
JUDGE AMY ST. EVE

---

**CORRECTED OPENING BRIEF OF APPELLANT**

Jonathan Hangartner               Steven P. Fallon
X-Patents, APC                    Greer, Burns & Crain, Ltd.
5670 La Jolla Blvd.               300 South Wacker Drive, Suite 2500
La Jolla, California  92037       Chicago, Illinois  60606
Telephone:  (858) 454-4313        Telephone:  (312) 360-0080
jon@x-patents.com                 sfallon@gbclaw.net

*Counsel for Appellant Sonix Technology Co., Ltd.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant certifies the following:

**1.     The full name of every party or amicus represented by me is:**

Sonix Technology Co., Ltd.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Sonix Technology Co, Ltd.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

None.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:**

<u>X-Patents, APC</u>: Jonathan Hangartner

<u>Greer, Burns & Crain, Ltd</u>: Steven P. Fallon


Dated: March 28, 2016              Respectfully submitted,

                                   By: <u>/s/  Jonathan Hangartner</u>
                                   Jonathan Hangartner
                                   X-PATENTS, APC
                                   5670 La Jolla Boulevard
                                   La Jolla, CA 92037

i

Telephone: (858) 454-4313
Facsimile: (858) 454-4314
jon@x-patents.com

*Attorney for Plaintiff-Appellant*
*Sonix Technology Co., Ltd.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF RELATED CASES ................................................ vii

PRELIMINARY STATEMENT .......................................................... 1

JURISDICTIONAL STATEMENT .................................................... 2

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF FACTS ................................................................. 4

    A.  U.S. Patent No. 7,328,845 ...................................................... 4

    B.  First Reexamination of the '845 Patent ................................. 9

    C.  Second Reexamination of the '845 Patent ........................... 10

    D.  The Accused Products ......................................................... 12

    E.  The Issue of Indefiniteness In the Court Below ................... 14

    F.  Motions to Amend and For Summary Judgment................... 20

    G.  The District Court's Summary Judgment Ruling ................. 21

SUMMARY OF ARGUMENT ........................................................ 22

STANDARD OF REVIEW .............................................................. 24

ARGUMENT.................................................................................... 25

I.  THE DISTRICT COURT ERRED IN RULING THE CLAIMS
    INDEFINITE AS A MATTER OF LAW BECAUSE THE TERM
    "VISUALLY NEGLIGIBLE" INFORMS THOSE OF SKILL IN
    THE ART ABOUT THE SCOPE OF THE INVENTION WITH
    REASONABLE CERTAINTY WHEN READ IN THE CONTEXT
    OF THE SPECIFICATION.......................................................... 27

## TABLE OF CONTENTS—cont'd

Page

A.  By its Plain Meaning Viewed in Light of the Specification, The Claim Term "Visually Negligible" is Reasonably Certain to a Person of Skill in the Art.................................................................. 27

B.  Persons of Skill in the Art Have Had No Difficulty Understanding and Consistently Applying the Term "visually negligible" to Both Accused Products and Prior Art ................................................ 33

C.  The Relevant Art Provides Additional Context for Understanding the Term Visually Negligible............................................................. 37

D.  Defendants-Appellees Failed to Meet Their Burden of Proving Invalidity by Clear and Convincing Evidence, and the District Court Erred in Failing to Properly Consider the Claims in the Context of the Intrinsic and Extrinsic Evidence. ............................... 39

II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF INDEFINITENESS BECAUSE IT FAILED TO INDIVIDUALLY CONSIDER EACH ASSERTED CLAIM..................... 43

A.  The District Court Erred in Determining That the Patents-In-Suit Were Indefinite Based on the Presence of the Term Visually Negligible Without Independently Considering Each Claim ........... 43

B.  Dependent Claims 60 and 77 Include Objective Requirements that Render them Reasonably Certain................................................. 45

CONCLUSION ................................................................................. 47

# TABLE OF AUTHORITIES

**Page**

**Cases**

*520 S. Mich. Ave. Assocs. v. Unite Here Lcoal 1*,
   760 F.3d 708, 718 (7th Cir. 2014) ............................................................ 21

*Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp.*,
   294 U.S. 477, 487 (1935)........................................................................ 41

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)........................... 21, 22

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
   783 F.3d 1374, 1377 (Fed. Cir. 2015)........................................................ 21

*Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 437 (1902)..................... 23

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342, 1351 (Fed. Cir. 2005) ....................................................... 26

*Eibel Process Co. v. Minn. & Ontario Paper Co.*,
   261 U.S. 45, 65-66 (1923) ....................................................................... 25

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325, 1332 (Fed. Cir. 2010) ....................................................... 22

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722, 731 (2002) ........................................................................ 23

*GPNE Corp. v. Apple, Inc.*,
   108 F. Supp. 3d 839, 874 (N.D. Cal. June 9, 2015) ............................... 30, 32

*Interconnect Planning Corp. v. Feil*,
   774 F.2d 1132, 1137 (Fed. Cir. 1985) ....................................................... 40

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364, 1370 (Fed. Cir. 2014) ....................................................... 25

# TABLE OF AUTHORITIES—cont'd

**Page**

*Ivera Med. Corp. v. Hospira, Inc.,*
  801 F.3d 1336, 1343 (Fed. Cir. 2015) ........................................... 21

*Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984) .......................... 41

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) ...................... 23

*Minerals Separation, Ltd. v. Hyde*, 242 U. S. 261, 270 (1916) .............................. 23

*Nautilus v. Biosig Instruments*, 134 S. Ct. 2120, 2128 (2014) ........................ 23, 36

*Pall Corp. v. Micron Separations, Inc.,*
  66 F.3d 1211, 1220 (Fed. Cir. 1993) ............................................. 41

*SRAM Corp. v. ADII Eng'g, Inc.,*
  465 F.3d 1351, 1357 (Fed. Cir. 2006) ........................................... 21

*Sys. Mgmt. Arts, Inc. v. Avesta Techs., Inc.,*
  137 F. Supp. 2d 382, 402 (S.D.N.Y. 2001) ................................... 22

*Teva Pharm., USA, Inc. v. Sandoz, Inc.,*
  135 S. Ct. 831, 842 (2015) .......................................................... 22

*Thought, Inc. v. Oracle Corp.,*
  2014 U.S. Dist. LEXIS 150127, at *34 (N.D. Cal. Oct. 22, 2014) .............. 25

## Statutes

35 U.S.C. § 112 ........................................................................ 13, 19, 22

## Rules

Fed. R. Civ. P. 56(a) ................................................................... 21

vi

## STATEMENT OF RELATED CASES

There are no related cases.

## PRELIMINARY STATEMENT

The district court granted summary judgment, ruling that U.S. Patent No. 7,328,845 (the '845 patent) is invalid for indefiniteness." The '845 Patent discloses and claims a novel way of encoding information into patterns of small dots that can be printed on a surface like the page of a book such that they do not interfere visually with the words and/or images on the page. The dot patterns, however, can be read by a handheld device and used to enrich the user's experience by providing supplementary information beyond that shown in text and images.

In invalidating the '845 patent as indefinite, the district court erred in concluding that claim limitations requiring the "graphical indicators" that form the dot pattern to be "visually negligible" are not reasonably certain. The evidence establishes that the term "visually negligible" as used in the claims of the '845 patent is a term of degree that is sufficiently clear to inform those skilled in the art about the scope of the invention with reasonable certainty. Whether a dot pattern is "visually negligible" is grounded in human perception, and the specification provides detailed objective criteria and examples for creating dot patterns that are "visually negligible." These criteria and examples are well understood by those of skill in the art, as reflected in their consistent application to both the prior art and the accused products as well as in other patents relating to dot pattern encoding

1

technology.   Accordingly, the district court erred as a matter of law in granting Defendants-Appellees' motion for summary judgment.

As an independent ground for reversal, the district court also erred in failing to give proper consideration to each individual dependent claim.   Rather than considering the term "visually negligible" in the context of each individual claim, the district court made a general finding that the claim term is indefinite, then simply held that "the '845 patent is invalid for indefiniteness."   The district court's failure to independently evaluate each claim is particularly problematic with respect to dependent claims 60 and 77.   Both of these claims include specific, objective, numeric requirements reflecting exemplary embodiments from the specification that meet the visually negligible claim limitation.

The district court cannot ignore its clear mandate to independently evaluate each claim on its own merits.   Thus, even if the claims that lack these specific limitations are found to be indefinite, the additional limitations in claims 60 and 77 render those claims far more than "reasonably certain."

The judgment should be reversed, and the case remanded for further proceedings.

## JURISDICTIONAL STATEMENT

In 2013, Sonix Technology Co., Ltd. ("Sonix") filed suit against PIL and SD-X Interactive for patent infringement.   Later in 2013, Sonix amended the

2

complaint to assert infringement of the same patent against Herff Jones and Encyclopaedia Britannica. Because these suits involved patent infringement, the district court had subject matter jurisdiction over them under 28 U.S.C. §§ 1331 & 1338.

On December 8, 2015, after granting summary judgment to Defendants-Appellees, the district court entered final judgment. Because Sonix filed a timely notice of appeal on January 6, 2016, this Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in ruling that the claims of the patents-in-suit are indefinite as a matter of law where the claim term "visually negligible" is a term of degree that is reasonably certain to a person of skill in the art when considered in the context of the specification of the '845 patent.

2.    Whether the district court erred in failing to independently consider each claim and ruling that dependent claims that include objective criteria for visual negligibility are indefinite as a matter of law because they depend from an independent claim that was held indefinite.

## STATEMENT OF FACTS

### A.    U.S. Patent No. 7,328,845

Sonix asserts infringement of U.S. Patent No. 7,328,845 (the '845 patent), A68-98.[1]  The '845 Patent discloses and claims a novel way of encoding information into patterns of small dots that can be printed on a surface like the page of a book such that they do not interfere visually with the words and/or images on the page.  The dot patterns, however, can be read by a handheld device and used to enrich the user's experience by providing supplementary information beyond that shown in text and images.  A86(col. 1, ll. 7-67).

For example, a publisher can print a book and sell it with an optical pen. When the user points the optical pen at the page, it may output the sound of person reading the text or provide additional information related to an image on the page. This allows the publisher to add multi-media information to a printed publication.

### 1.    Basic Functionality of Dot Pattern Encoding Technology

The concept of encoding digital information in marks printed on a surface is not new.  However, historically the encoding marks – such as "bar codes" – were large and visually intrusive.  The '845 patent describes a method for producing dot patterns that can be printed on a surface like a the page of a book, overlapping and

---

[1]  Record citations are designated "A_" for record pages bates numbered "Appx. _."

4

co-existing with text and/or images without interfering with the user's perception of such "main information." A68 (Abstract), 86 (col. 1, ll. 48-57).

The dots are printed in small patterns referred to as "graphical indicators," and the text and/or visual images on the surface are referred to as the "main information." A86-87 (col. 2, ln. 57 – col. 3, ln. 3). The graphical indicators are read and decoded by an optical pen. The optical pen uses a digital camera to capture an image of the dot pattern, processes the image, identifies and decodes an individual "graphical indicator" from within the larger pattern of dots to obtain its "indicator information," and then outputs any associated "additional information" such as sounds or images through an output device such as a speaker. A88-89 (col. 6, ln. 45 – col. 8, ln. 42).

2.     Relevant Features of the Invention Claimed in the '845 Patent

One of the challenges faced by developers was the design of a dot pattern that can be reliably read. Since the dot pattern overlaps with the text and pictures, it must be printed such that an image of the dot pattern can be consistently captured and decoded without visually interfering with the "main information." As expressed in the '845 patent, the dot pattern must be "visually negligible." A87 (col. 3, ll. 5-11).

The '845 patent discloses a novel dot pattern technology that addresses these issues. As described in an exemplary embodiment shown in Figures 1(A) – 1(F), a

single graphical indicator may take the form of a two-dimensional matrix of small areas called "state zones."  A70-73, A87 (col. 3, ll. 32-42).  The example shown here in Figure 1(B) is a 6 x 6 matrix containing thirty-six (36) state zones (113):



**Fig.1(B)**

Each state zone can take one of two possible "states" – it either contains "graphical micro-unit" or it does not.  A87 (col. 3, ll. 37-42).  A "graphical micro-unit" may be a dot or other shape, but for best results it "must be so tiny that only a microscope apparatus can detect it."  A87 (col.3, ll. 21-24).  "When the graphical micro-units are tiny and arranged loosely in the layout, the user easily neglects the combination 100 of graphical micro-units and pays attention to the main information."  A87 (col. 3, ll. 25-28).

As illustrated in Figure 1(D) below, graphical indicators can be arranged adjacent to each other on all sides:



Fig.1(D)

Using such an arrangement, "the graphical indicators and the graphical micro-units look homogenous to human eyes." A87 (col. 3, ll. 50-54).

The requirement that graphical indicators must be "visually negligible" is referenced throughout the specification. A68 (Abstract), A86-88, 90 (col. 1, ll. 45-49; col. 2, ll. 57-64; col. 3, ll. 5-20; col. 4, ln. 60 – col. 5, ln. 15; col. 10, ll. 1-6). This includes a section devoted to the topic, which details the "requirements for the graphical indicators being negligible to human eyes" as follows:

> First, each graphical indicator must be tiny and human eyes can not differentiate one graphical indicator from others. Second, according to the size of the graphical micro-unit, the pitch between micro-unit, and the desired visual effect, one should reduce the number of the graphical micro-units used. In this way, the graphical indicators have little influence on the brightness of the surface of object. Furthermore, number of graphical micro-units of each graphical indicator is substantially equal to each other, and therefore the graphical indicators look more homogenous to human eyes and become invisible to human eyes.

7

In a first embodiment, each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

In a second embodiment, each square centimeter of the selected zone includes more than 6000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

A87-88 (col. 4, ln. 60 – col. 5, ln. 15). This discussion and the exemplary embodiments establish specific, objective physical criteria for a graphical indicator that will be visually negligible.

### 3.    The Relevant Claims

All of the asserted claims require graphical indicators that are visually negligible. Independent claims 9, 25, and 35, and dependent claims 57 and 75, require the "visually negligible" graphical indicators in the specific context of a related requirement that the dots that make up the graphical indicator must overlap and co-exist with the text and images on the surface, and must be "negligible when the user observes the main information." A90-92 (col. 10, ln. 20 – col. 13, ln. 46); A94; A95-96 (col. 1, ln. 60 – col. 3, ln. 23). For example, claim 9 requires in relevant part:

9.    A processing system comprising:

an optical device for capturing an image from a selected zone on a surface of an object by a user, wherein the image includes a graphical indicator that is visually negligible and is affixed on the surface of the object;

* * *

8

wherein the surface of the object comprises a main information that overlaps and co-exists with the graphical micro-units on the surface of the object, wherein the graphical micro-units are negligible when the user observes the main information; . . .

A90-91 (col. 10, ln. 20 – col. 11, ln. 11).

Dependent claims 60 and 77 also include objective physical requirements for visual negligibility taken directly from the first exemplary embodiment in the specification.  A95-96 (col. 2, ll. 8-12; col. 3, ll. 29-33).  Each requires a density of more than 3000 state zones per square centimeter, of which less than seventy percent are in the first state (have a dot), and the percentage of area occupied by the dot in the state zone is less than 80.

## B.     First Reexamination of the '845 Patent

In 2010 Sonix asserted the '845 patent in a prior litigation against VTech Electronics North America, LLC ("VTech") based on children's books using dot pattern technology provided by a Taiwanese company called GeneralPlus.  *See Sonix Technology Co. Ltd. v. VTech Electronics North America, LLC*, Case No. 1:10-cv-08291 (N.D. Ill.), Doc. No. 79 (Initial Status Report).  In January 2011, GeneralPlus's parent company SunPlus Technology Co. Ltd. ("SunPlus") filed a request for *ex parte* reexamination of the '845 patent.  A784-884.

During the reexamination, it was never disputed that the prior art references cited in the reexamination disclosed the concept of a visually negligible dot pattern, and neither the parties nor the Patent Office raised any indefiniteness issue

9

with respect to the claim term "visually negligible."  On December 27, 2011, the Patent Office issued an Ex Parte Reexamination Certificate confirming the patentability of original claims 9, 15, 25, 35-39, and 46-49 of the '845 patent, cancelling claims 1-8, 10-14, 16-24, 26-34, 40-45, 50 and 51, and adding new claims 52-90.  A94-96.

## C.    Second Reexamination of the '845 Patent

On January 23, 2012, GeneralPlus filed a request for reexamination of all the claims of the '845 patent based on three (3) prior art references.  A1937-2037.  On March 19, 2012 the Patent Office issued a non-final office action rejecting all of the claims of the '845 patent as obvious in view of the *Lamoure* reference combined with either the *Priddy* reference, the *Frazer* reference, or both.  A2309-2317.

Application of the "visually negligible" claim limitations in the context of the proposed combination of the prior art *Lamoure* and *Priddy* references was central to the subsequent reexamination proceedings.  A2324-2335.  It was undisputed that *Lamoure* discloses visually negligible dot patterns, and that the graphical indicators in *Priddy* are designed to be prominent and visually intrusive so they can be easily found and scanned.  Sonix argued that a person of ordinary skill in the art would not combine the *Lamoure* and *Priddy* references by substituting the "dot matrix" used in *Priddy* for the "checkerboard" pattern used in

10

*Lamoure* because the resulting dot pattern "would ***not*** be visually negligible." A2327-2331 (quotation at A2328 (emphasis in original)). Sonix pointed out that *Lamoure* expressly teaches the importance of dot patterns that do not interfere with the text and images on the surface, and further teaches the importance of having "a low-density, isotropic distribution of dots"[2] to achieve this goal. A2328. In contrast, *Priddy* teaches perimeter lines with a high-density, uneven or "anisotropic" distribution of dots. A2328-2331.

Sonix argued that the proposed combination of *Lamoure* with *Priddy* would lead to the "result of multiple high density, anisotropic matrices – a result that would cause the matrices to interfere with the user's perception of the text and images on the page." A2329. Thus, "[t]he predictable result of combining *Lamoure* and *Priddy* is a pattern that is ***not*** visually negligible, but rather which substantially interferes with the text and images on the surface." A2329 (emphasis in original).

Sonix supported its argument with an affidavit by Sejer Sejersen, an expert in printing. A2320, 2337-2345, 5314-5325. Mr. Sejersen created exemplars of printed dot patterns with various structures to illustrate the visual impact of the solid perimeter lines of the dot pattern disclosed in *Priddy*. A5314-5325. Mr.

---

[2] An "isotropic" distribution means that the dots are evenly distributed in all directions.

Sejersen noted that substitution of the dot pattern disclosed in *Priddy* for the "checkerboard pattern" used in *Lamoure* results in a dot pattern that "materially interferes with the user's ability to see the underlying image or text." A2343-2344 (discussing Exemplar X).

The Patent Office agreed, confirming the patentability of claims 9, 25, 35-38, 46-49, and 52-90 of the '845 patent. A2353-2369, A2377-2386. In its statement of reasons for patentability, the Patent Office found that "the **critical element** of: *a graphical indicator that is visually negligible* **wherein** *the graphical indicator comprises a header information* is found not to be obvious over the Lamoure, Priddy, and Frazer references." A2364 (emphasis in original).[3]

### D.    The Accused Products

Defendant-Appellee Publications International, Limited ("PIL") initially used Sonix's dot pattern technology for its children's books sold under the brand name "Poingo." A5563-5571 (¶ 9); *see also* A5163-5164. PIL formed Defendant-Appellee SD-X Interactive, Inc. ("SD-X") to further develop dot pattern products and to provide dot pattern technology to third-party publishers. A5563-5571 (¶¶ 9-10). PIL and SD-X subsequently replaced Sonix and used a dot pattern technology

---

[3]    In April 2012, Sonix and VTech reached a settlement agreement on mutually beneficial terms and Sonix's infringement claim against VTech was dismissed.

supplied by its competitor GeneralPlus in their subsequent products.  A5563-5571 (¶¶ 13, 16-19).

One example of the accused products sold by PIL is the "My Interactive Point-and-Play 5-Book Library," a book and optical pen set shown below:





A5165-5                                        nd associated text on the pages of the books, a very faint pattern of tiny dots is printed on the pages.

A5165-5166, 5170, 5173.  The tiny dots do not interfere with the text or images. A5165-5166, 5170, 5173.  The optical pen can be pointed at the pages of the books and it will output particular sounds related to the text and/or images on the part of the page at which it is pointed.  A5165-5168, 5170, 5173.  For example, if the optical pen is pointed at the image of the tree or the text of the word "tree," it will output the sound of a voice saying the word "tree."  A5167.

### E.    The Issue of Indefiniteness In the Court Below

The parties and their experts applied the claim term "visually negligible" extensively to both the prior art and the accused products through more than two (2) years of litigation, yet Defendants-Appellee's never asserted that the term was indefinite until they filed their motion for summary judgment.

### 1.    Initial Invalidity Contentions

The district court's local patent rules required the parties to exchange initial infringement and invalidity contentions including "a detailed statement of any grounds of invalidity based on indefiniteness."    N.D.  Ill.  L.P.R.  2.3(b)(4). Defendants-Appellees identified a host of "Indefiniteness Issues" in their initial contentions.    A2636-2641.    They did *not* contend that the term "visually negligible" was indefinite.  A2636-2641.

### 2.    Relevant Claim Construction Proceedings

14

Defendants-Appellees' initially sought construction of the term "visually negligible" and proposed that it be construed to mean "imperceptible to the human eye, such that it does not interfere with a human's ability to view the main information." A2429-2430. On June 2, 2014, new counsel took over the defense. A57 [Doc. No. 113]. New counsel subsequently proposed that the term "visually negligible" should be given its ordinary meaning. Sonix agreed, Defendants-Appellees withdrew their proposed construction, and the parties stipulated that "visually negligible" should be given its ordinary meaning. A2434-2436. Defendants-Appellees did not assert that "visually negligible" was indefinite at any point during the claim construction proceedings.

### 3.    Final Invalidity Contentions

On January 28, 2015, Defendants-Appellees served Final Invalidity Contentions adopting as final their prior invalidity contentions based on 35 U.S.C. § 112, with the addition of two more claim terms alleged to be indefinite. A3021-3031. Defendants-Appellees again did not contend that the term "visually negligible" was indefinite. On February 25, 2015, Defendants-Appellees served a Response to Sonix's Final Infringement Contentions that attempted to put at issue a host of claim elements not previously disputed. A4113-4164. One of the few issues that remained undisputed was that the accused products satisfy the "visually negligible" claim requirement. A4113-4164 (*see, e.g.,* claim chart at A4122

15

stating that "Defendants admit that the dots printed in the Identified Product(s) are visually negligible, and therefore would fall within the literal scope of that requirement in this claim element").

### 4.    Expert Reports and Depositions

On May 5, 2015, Sonix served the opening report of its technical expert Amit Ashok on the issue of infringement. A3070-3125. Dr. Ashok offered the following expert opinion regarding the requirement that graphical indicators must be "visually negligible":

> The '845 Patent indicates that the term "visually negligible" means that the dots (or micro-units) printed on the surface do not interfere with the visually significant text and images – referred to in the '845 Patent as "main information" – on the surface.
> The dot patterns printed on the Accused Products are visually perceptible to a degree if one views the printed material very carefully at close distance in the proper lighting, but they do not interfere at all with the user's perception of the text and images on the surface. A typical user is unlikely to even notice and would not pay any attention to these background patterns on the pages of the various books and globes in question when they are viewing the text and images. Thus, it is my opinion that the dot patterns printed on all of the Accused Products satisfy the claim requirement that they be "visually negligible."

A3087-3088.

On June 1, 2015, Defendants-Appellees served a responsive report by their technical expert Dr. Engels. A4166-4228. Dr. Engels expressly agreed with Dr. Ashok that the accused products included graphical indicators that were visually negligible. A4210-4211 (¶ 144). Dr. Engels also offered his opinion that creating

16

a visually negligible dot pattern is not difficult, asserting that "***it would be a simple matter to ensure that any pattern being used would be printed in a manner that would be visually negligible compared to the main information on a page.  It is, essentially, a matter of size and refinement of the pattern elements.***"   A4228 (¶ 213) (emphasis added).

In his report on validity, Dr. Engels applied the term "visually negligible" without hesitation and offered no testimony on any issue of indefiniteness.  A5335-5451.  Dr. Engels asserted that the claims should be found invalid as anticipated and/or obvious in view of the prior art *Lamoure* and *Yamaguchi* references, and applied the term "visually negligible" in the context of both references.   With respect to *Lamoure*, Dr. Engels asserted that it discloses that "[t]he dots can be printed in a density and size such that they would be visually negligible," and that "*Lamoure* shows very small dots that are visually negligible and printed onto the surface of the reading material." A5348 (¶¶ 48-50).  Dr. Engels concluded that "it is my opinion that Lamoure discloses a system 'wherein the image includes a graphical indicator that is visually negligible.'"  A5349  (¶ 53).

Dr. Engels later offered a more technical analysis of the disclosure of *Lamoure*, asserting that:

> Each ink dot is between 50 μm and 100 μm in diameter. *See, e.g.*, 4:5. At this size, each dot is on the size order of tens of micro-meters and is clearly a micro-unit that is a visually negligible feature. *Lamoure* clearly discloses "ink dots" of a size that is visually negligible to the

17

> human eye. *Lamoure* discloses a 1millimeter by 1millimeter index pattern of these micro-units. *See, e.g.*, 4:15-16. At this size, the index is either visually negligible or is viewed as a background material by the human eye.

A5355-5356 (¶ 85).  Dr. Engels also had no difficulty applying the term "visually negligible" in his analysis of *Yamaguchi*, opining that "*Yamaguchi* shows very small dots, in the form of pixels, that encode data, are visually negligible and are printed, in encoded form, on the surface of the reading material.  *See, e.g.*, Figs. 15 and 16; 8:43-47; 10:31-33." A5419 (¶ 333).  Dr. Engels  explained that "[w]hen done at sufficiently high levels of resolution, i.e., sufficiently small pixel size, the resulting encoded embedded image pixels are visually indistinguishable from the surrounding pixels by the human eye."  A5430-5431 (¶ 382). According to Dr. Engels, *Yamaguchi* identifies printing at a resolution of 400 dpi at which "the graphical micro-units, i.e., the pixels, are visually negligible when the user observes the main information." A5431 (¶ 382).

In his rebuttal report on validity, Sonix's expert Dr. Ashok explained that the codes disclosed in *Priddy* were not intended to be and were not visually negligible. A3523-3604 (discussion at A3538-3541).   Dr. Ashok also explained that *Lamoure*'s proposal for differentiating among indexes and determining orientation by arranging indexes in a "checkerboard pattern" could cause a visual impact due to the changes in dot density.  A3545-3547.  Dr. Ashok did not assert that *Lamoure* fails to disclose the use of a visually negligible dot pattern, and at his deposition he

18

testified that *Lamoure* "doesn't want these dot codes to be visually apparent." A4772 [115:24-117:14].

On July 16, 2015, Dr. Ashok was asked a series of questions at deposition regarding the term "visually negligible." Dr. Ashok testified that based on his knowledge and experience, "I understand visually negligible to mean that if these dot patterns are imprinted on a surface, with a cursory look, I will not notice that." A4755 [46:25-47:13]. However, "depending on visual acuity, you could probably notice it if you look carefully or magnify that dot pattern." *Id.* Dr. Ashok also testified that a dot pattern can be made "visually negligible" by printing the dots "smaller" and that the '845 patent provides "example densities" of dots that would result in visually negligible dot patterns. A4755 [48:3-22].

Dr. Ashok went on to explain that visibility "is not entirely dependent on the size of the dots" and may be impacted by the placement of the dots, particularly if they are connected into lines, and the type of inks used. A4756 [49:6-50:17]. Dr. Ashok then testified that the example dot densities provided in the specification of the '845 patent serve as a reference for a visually negligible dot pattern, and that while there is no numeric standard for measuring visual negligibility, he believed that "the general population would be very close to a standard threshold." A4756 [50:18 – 51:21].

19

At his deposition, Dr. Engels for the first time offered his opinion that the term "visually negligible" is a "subjective matter." A3708-3709 [15:22-16:7]. Dr. Engels did not offer any other opinions regarding the term visually negligible, or on any issue of indefiniteness.

### F.    Motions to Amend and For Summary Judgment

On July 27, 2015, Defendants-Appellees moved for summary judgment that the asserted claims of the '845 patent are invalid as indefinite.[4] A60 [Doc. No. 155]. That same day they also moved to amend their Final Invalidity Contentions to assert – for the first time – a contention that the term "visually negligible" was indefinite. A2551-2565. Defendants-Appellees asserted that the term visually negligible is "subjective in nature and lacks any objective test to determine its scope." A2555.

According to Defendants-Appellees, they were completely unaware of this indefiniteness issue until the deposition of Sonix's expert Dr. Ashok, and that "[a]s a result of Dr. Ashok's testimony, all of the claims are indefinite under 35 U.S.C. §112 ¶2, because the term 'visually negligible' fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention." A2555.

---

[4] Defendants also moved for summary judgment of non-infringement based on an argument that Sonix could not meet its burden of proof with respect to infringement, and for an order barring Sonix from recovering pre-suit damages. The district court denied the motion with respect to these issues as moot in view of its decision granting summary judgment of invalidity. A42.

### G.    The District Court's Summary Judgment Ruling

On December 8, 2015, the district court issued its Memorandum Opinion and Order granting summary judgment based on its ruling that "the '845 patent is invalid for indefiniteness." A3-42.

The district court's opinion is grounded in its understanding that the specification does not provide guidance as to the factors affecting visual negligibility that would provide one of skill "with reasonable certainty of the claim scope." A32. According to the district court, the express disclosures of criteria for visual negligibility including shape, size, number, density, and proportion and the examples of specific state zone densities, dot densities, and proportional dot size "lack[] the necessary detail to make the requirements meaningful or to provide the person of ordinary skill with reasonable certainty of the scope of the claim's terms beyond the requirements." A33.

While recognizing that the specification describes "visually negligible" by reference to human perception of the main information, the district court considered it to be a question of personal aesthetics. As the district court explained, the "aesthetic aspects of the design as 'visually negligible' rely on a term that provides no test or measure for the person of ordinary skill in the art to use in answering the question of whether their graphical indicator is 'visually negligible'." A41.

21

While "not necessary for the Court's consideration here," the district court also indicated that the extrinsic evidence "highlights the problem with the subjective nature of the 'visually negligible' claim term." A35. This was based on the district court's understanding that the experts "disagree in their ultimate opinions" regarding whether the prior art *Lamoure* reference discloses a "visually negligible" dot pattern. A35-36. The district court believed that their purported disagreement "confirms the subjective application of the 'visually negligible' claim term in practice." A40.

All of this reflects the district court's search for a numeric value or a precise measurement for visual negligibility. A39-42. Ultimately, finding no "method of measurement" or numeric value, the district court found the term "visually negligible" to be indefinite. A42.

## SUMMARY OF ARGUMENT

The district court erred in ruling that the '845 patent is invalid as indefinite.

1.     The district court erred in concluding that claim limitations requiring the "graphical indicators" that form the dot pattern to be "visually negligible" are not reasonably certain. Defendants'-Appellees failed to meet their burden of proving that the '845 patent is indefinite by clear and convincing evidence. The district court erred in failing to consider evidence establishing that the term

"visually negligible" as used in the claims of the '845 patent is a term of degree that is sufficiently clear to inform those skilled in the art about the scope of the invention with reasonable certainty. Whether a dot pattern is "visually negligible" is grounded in human perception, and the specification provides detailed objective criteria and examples for creating dot patterns that are "visually negligible." These criteria and examples are well understood by those of skill in the art, as reflected in extensive evidence establishing their consistent application to both the prior art and the accused products, as well as in other patents relating to dot pattern encoding technology.

2.    The district court also erred in failing to give proper consideration to each individual dependent claim. Each claim of a patent is a separate invention and its validity must be independently evaluated. Rather than considering the term "visually negligible" in the context of each individual claim, the district court made a general finding that the claim term is indefinite, then simply held that "the '845 patent is invalid for indefiniteness." In particular, the district court failed to independently evaluate dependent claims 60 and 77. Both of these claims include specific, objective, numeric requirements reflecting exemplary embodiments from the specification that meet the visually negligible claim limitation. The district court erred in ruling that these claims are invalid because they depend from an invalid claim. Even if the claims that lack these specific limitations are found to be

23

indefinite, the additional limitations in claims 60 and 77 render those claims sufficiently definite.

## STANDARD OF REVIEW

When reviewing a summary judgment ruling, this Court applies the regional circuit's standard of review. *Ivera Med. Corp. v. Hospira, Inc.,* 801 F.3d 1336, 1343 (Fed. Cir. 2015). In the Seventh Circuit, summary judgment is reviewed *de novo*. *520 S. Mich. Ave. Assocs. v. Unite Here Lcoal 1*, 760 F.3d 708, 718 (7th Cir. 2014). Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmovant, there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Accordingly, at the summary judgment stage, prior to trial, any material factual dispute precludes a finding of summary judgment. *Id.* at 248; *see Ivera Med. Corp.*, 801 F.3d at 1346 (reversing the district court's entry of summary judgment of invalidity, finding existence of a genuine factual dispute). A party moving for summary judgment based on invalidity, therefore, "must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." *SRAM Corp. v. ADII Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006).

This Court reviews the district court's indefiniteness determination *de novo*. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015).

24

"In the face of an allegation of indefiniteness, general principles of claim construction apply." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377-78 (Fed. Cir. 2015) (quoting *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010)). The ultimate construction of a claim term is a legal question that is reviewed *de novo*. *Teva Pharm., USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 842 (2015). Claim construction can require underlying factual findings based on extrinsic evidence. *Id.* After trial, such extrinsic fact findings are reviewed under the "clear error" standard. *Id.* However, the existence of a material factual dispute at the summary judgment stage regarding such underlying extrinsic factual questions precludes summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255 (1986); *see Sys. Mgmt. Arts, Inc. v. Avesta Techs., Inc.*, 137 F. Supp. 2d 382, 402 (S.D.N.Y. 2001) (holding summary judgment was precluded because the extrinsic evidence gave rise to a genuine issue of material fact as to indefiniteness); *see also Ivera Med. Corp.*, 801 F.3d at 1346 (reversing district court's entry of summary judgment of invalidity, finding existence of a genuine factual dispute).

## ARGUMENT

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. Application of the definiteness requirement of

Section 112 "entails 'a delicate balance.'" *Nautilus v. Biosig Instruments*, 134 S. Ct. 2120, 2128 (2014) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002)). A "patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'" *Id.* at 2129 (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)); *see also Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 437 (1902) ("any description which is sufficient to apprise [steel manufacturers] in the language of the art of the definite feature of the invention, and to serve as a warning to others of what the patent claims as a monopoly, is sufficiently definite to sustain the patent"). Yet, the definiteness requirement must take into account "the inherent limitations of language," thus some "modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Nautilus*, 134 S. Ct. at 2128 (quoting *Festo Corp.*, 535 U.S. at 732).

In striking this delicate balance, the Supreme Court has read § 112, ¶2 "to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.* at 2129. This standard "mandates clarity, while recognizing that absolute precision is unattainable." *Id.* The result is that "the certainty which the law requires in patents is not greater than is reasonable, having

regard to their subject-matter." *Id.* (quoting *Minerals Separation, Ltd. v. Hyde*, 242 U. S. 261, 270 (1916)).

## I.    THE DISTRICT COURT ERRED IN RULING THE CLAIMS INDEFINITE AS A MATTER OF LAW BECAUSE THE TERM "VISUALLY NEGLIGIBLE" INFORMS THOSE OF SKILL IN THE ART ABOUT THE SCOPE OF THE INVENTION WITH REASONABLE CERTAINTY WHEN READ IN THE CONTEXT OF THE SPECIFICATION

The evidence establishes that the term "visually negligible" as used in the claims of the '845 patent is a term of degree that is sufficiently clear to inform those skilled in the art about the scope of the invention with reasonable certainty. Whether a dot pattern is "visually negligible" is grounded in human perception rather than opinion, and the specification provides detailed objective criteria and examples for creating dot patterns that are "visually negligible." These criteria and examples are well understood by those of skill in the art, as reflected in their consistent application to both the prior art and the accused products as well as in other patents relating to dot pattern encoding technology. Accordingly, the district court erred as a matter of law in granting Defendants-Appellees' motion for summary judgment.

### A.    By its Plain Meaning Viewed in Light of the Specification, The Claim Term "Visually Negligible" is Reasonably Certain to a Person of Skill in the Art

The claim term "visually negligible" is a term of degree. As used in the claims of the '845 patent, it requires the "graphical indicators" forming the dot

pattern to have a "negligible" visual impact on the text and images that they overlap with on the surface. The specification of the '845 patent includes a detailed discussion of specific criteria and examples that provide context to assure that persons of ordinary skill in the art understand the objective boundaries of the "visually negligible" claim limitation.

As this Court has consistently explained, terms of degree are not inherently indefinite and "absolute or mathematical precision is not required" of such claim limitations. *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1370 (Fed. Cir. 2014). So long as the claims, when viewed in light of the specification and prosecution history, provide "objective boundaries" for those of skill in the art, the claims are not indefinite. *Id.* at 1371 (citing *Nautilus*, 134 S. Ct. at 2130 & n.8); *see also Eibel Process Co. v. Minn. & Ontario Paper Co.*, 261 U.S. 45, 65-66 (1923) (finding the claim term "substantial pitch" sufficiently definite because one skilled in the art could determine what substantial pitch was needed to practice the invention); *Thought, Inc. v. Oracle Corp.*, 2014 U.S. Dist. LEXIS 150127, at *34 (N.D. Cal. Oct. 22, 2014) ("words of degree" are not indefinite where the remaining claim language and specification provide sufficient context).

This standard strikes the necessary "delicate balance" in that it "mandates clarity" while "recognizing that absolute precision is unattainable." *Nautilus*, 134 S. Ct. at 2128-29 (quoting *Festo Corp.*, 535 U.S. at 731); *see also Enzo Biochem,*

*Inc.*, 599 F.3d at 1335 (finding the claim term "not interfering substantially" sufficiently definite). Under this standard, patent claims are invalid as indefinite only when they rely on highly subjective terms that cannot be applied with reasonable consistency. *See, e.g.*, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005) (finding "aesthetically pleasing" indefinite because scope depends on the unrestrained, subjective opinion of a particular individual); *Interval Licensing*, 766 F.3d at 1371 (finding "unobtrusive manner" indefinite because it is "purely subjective" and the specification failed to provide useful guidance for its application).

Here, the term "visually negligible" is consistently used in the context of the visual relationship between the graphical indicators and the text and images ("main information") on the surface. The graphical indicators, which are not read by the user, and the main information that is read by the user, must co-exist on the surface such as the page of a book. As explained in the specification, the graphical indicators "do not interfere with the perception of human eyes to the main information." A86 (col. 2, ll. 60-64). This concept of having a "negligible" visual impact on the main information is maintained consistently throughout the specification. A68 (Abstract), A86-88, 90 (col. 1, ll. 45-49; col. 2, ll. 57-64; col. 3, ll. 5-20; col. 4, ln. 60 – col. 5, ln. 15; col. 10, ll. 1-6).

Limitations requiring graphical indicators that are "visually negligible" are used in the claims to capture this requirement. While there is no numeric standard for determining whether a graphical indicator is "visually negligible," the term visually negligible has "objective boundaries" that a person of skill in the art understands and can apply consistently. *See Interval Licensing*, 766 F.3d at 1371. It is not based on aesthetics or other personal opinion. The term "visually negligible" as used in the context of the visual impact of the dot pattern on the main information is based on human perception, and is sufficiently certain that it can be reasonably applied in the real world of determining infringement.

This is reflected in the specification. A claim term is not indefinite if the specification provides examples or teachings that can be used to measure a degree even without a precise numerical measurement. *See, e.g., Interval Licensing LLC*, 766 F.3d at 1371-72. Here, the specification provides detailed teachings and examples that provide objective standards for a visually negligible graphical indicator. These are found in a discussion of the "requirements for the graphical indicators being negligible to human eyes," which provides as follows:

> First, each graphical indicator must be tiny and human eyes can not differentiate one graphical indicator from others. Second, according to the size of the graphical micro-unit, the pitch between micro-unit, and the desired visual effect, one should reduce the number of the graphical micro-units used. In this way, the graphical indicators have little influence on the brightness of the surface of object. Furthermore, number of graphical micro-units of each graphical indicator is substantially equal to each other, and therefore

30

the graphical indicators look more homogenous to human eyes and become invisible to human eyes.

In a first embodiment, each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

In a second embodiment, each square centimeter of the selected zone includes more than 6000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

A87-88 (col. 4, ln. 60 – col. 5, ln. 15). This discussion and exemplary embodiments establish specific, objective criteria for graphical indicators that will be visually negligible.

These criteria and examples identify three general factors for determining what is visibly negligible: (1) differentiability, (2) brightness, and (3) homogeneity. The factor of differentiability is reflected in the criteria relating to size, shape, and density of the dots. The next two factors, brightness and homogeneity, relate directly to the visual impact of the graphical indicators on the main information on a page. The factor of homogeneity refers to maintaining an "even" or "isotropic" distribution of dots in all directions. If the distribution is not uniform, the pattern will have more of a visual impact. The remaining factor, brightness, is related to criteria for the size, pitch and number of dots.

Thus, the specification identifies three objective factors for determining visual negligibility that are reflected in specific, objective criteria. Additional context is provided by the two (2) exemplary embodiments that are described

31

specifically in connection with the "visually negligible" requirement. These provide examples of appropriate values for density of state zones, density of graphical micro-units, and the relative area occupied by each graphical micro-unit, as follows:

- **density of state zones** – (1) each square centimeter of the graphical indicator includes more than 3000 state zones;  (2) each square centimeter of the graphical indicator includes more than 6000 state zones  (col. 4, ln. 60 – col. 5, ln. 15);

- **density of graphical micro-units** – less than seventy percent (70%) of the state zones contain a graphical micro-unit (col. 4, ln. 60 – col. 5, ln. 15); and

- **relative area occupied by the graphical micro-units** – the percentage of the area of the state zones that is occupied by the graphical micro-unit is less than eighty percent (80%) (col. 4, ln. 60 – col. 5, ln. 15).

These objective and numerical teachings and examples provide exactly the type of context that  assures that persons of skill in the art understand the scope of a term of degree with reasonable certainty.  *See Thought, Inc.*, 2014 U.S. Dist. LEXIS 150127, at *34 ("words of degree" not indefinite where the specification provides context).  Thus the specification and claims provide ample "environment"

to understand the term "visually negligible," and the "necessary preciseness" of the language-at-issue. *See Thought Inc.*, 2014 U.S. Dist. LEXIS 150127, at *34.

The term "visually negligible" is not dependent "solely on the unrestrained subjective opinion of a particular individual." *See Datamaize*, 417 F.3d at 1350. It is based on human perception rather than opinion, and can be consistently evaluated by persons of skill in the art.

**B.    Persons of Skill in the Art Have Had No Difficulty Understanding and Consistently Applying the Term "visually negligible" to Both Accused Products and Prior Art**

The proceedings in the district court as well as in the prior reexaminations demonstrate that the term "visually negligible" is reasonably certain to those of skill in the art. In the district court, technical experts for both parties consistently applied the "visually negligible" claim limitation to both the accused products and the prior art. The Patent Office similarly had no difficulty applying this limitation, which was central to arguments presented in the second reexamination proceedings.

"A broad claim can be definite even where there is no precise numerical boundary so long as a person of skill in the art can determine the scope with reasonable certainty." *GPNE Corp. v. Apple, Inc.*,  108 F. Supp. 3d 839, 874 (N.D. Cal. June 9, 2015) (citing *Enzo Biochem, Inc.,* 599 F.3d at 1335). Here, the evidence in these proceedings, as well as in the extensive prior reexamination

proceedings, establishes that persons of skill in the art have no difficulty applying the term "visually negligible" consistently and with reasonable certainty.

This case was actively litigated for nearly two and a half years before Defendants-Appellees first contended that the claims are indefinite based on the term "visually negligible." During that span, Defendants-Appellees served initial invalidity contentions identifying other allegedly indefinite claim terms, sought a proposed claim construction for the term "visually negligible" then stipulated that it should be given its plain and ordinary meaning, and served final non-infringement and invalidity contentions applying the claims, including the "visually negligible" limitation, in the context of multiple prior art references and accused products without a hint of difficulty.

1.    Both Technical Experts Applied The Term Visually Negligible Consistently to Both the Accused Products and the Prior Art

Neither technical expert – the only two persons of skill in the art who have offered relevant evidence on this issue – has testified that that they believe the term "visually negligible" is indefinite. To the contrary, Defendants'-Appellee's expert Dr. Engels applied the term "visually negligible" repeatedly in the context of multiple prior art references and accused products without any uncertainty. A4210-4211 (¶ 144); A4228 (¶ 213); A5348 (¶¶ 48-50); A5349  (¶ 53); A5355-5356 (¶ 85); A5419 (¶ 333); A5430-5431 (¶ 382); A5431 (¶ 382). In doing so, Dr. Engels identified and discussed specific objective criteria for visual negligibility in

34

the prior art, explaining that *Lamoure* discloses dots with a diameter "on the size order of tens of micro-meters and is clearly a micro-unit that is a visually negligible feature." A5355-5356 (¶ 85). He similarly explained that an index pattern with dimensions of 1 millimeter by 1 millimeter "is either visually negligible or is viewed as a background material by the human eye." *Id.* Dr. Engels even expressed his opinion that "it would be a simple matter to ensure that any pattern being used would be printed in a manner that would be visually negligible compared to the main information on a page. It is, essentially, a matter of size and refinement of the pattern elements." A4228 (¶ 213).

Sonix's technical expert, Dr. Ashok, similarly had no difficulty applying the term visually negligible in the context of both the accused products and the prior art. A3087-3088; A3538-3541; A3545-3547. This evidence that the two (2) persons of ordinary skill in the art in this case consistently understood and applied claim limitations based on the term "visually negligible" is powerful evidence that the term is "reasonably certain." In *GPNE Corp. v. Apple, Inc.*, Apple argued that the claim term "randomly generated information" was indefinite because a person of skill in the art could not determine what "degree of randomness" was necessary to satisfy the limitation. 108 F. Supp. 3d at 873. The court explained that even if "randomly generated information" is considered a term of degree, it is sufficiently definite. *Id.* at 874.

35

In addition to the intrinsic evidence, the court noted that Apple's expert "appeared to have little difficulty understanding the scope of the term" in his testimony regarding obviousness. *Id.* In fact, "Mr. Rysavy did not hesitate, qualify, or otherwise evince uncertainty in identifying this limitation in the prior art, and identified it with more than reasonable certainty." *Id.* Such testimony "supports the conclusion that a person skilled in the art can determine the scope of this term, as he was able to confidently identify GSM prior art that met the 'randomly generated information' claim element," and "suggests that a person skilled in the art could determine, with reasonable certainty, the scope of GPNE's claims." *Id.*

Here, the case is far stronger that the term "visually negligible" is "reasonably certain" to persons of skill in the art. The technical experts for ***both*** sides have consistently and repeatedly applied the "visually negligible" claim limitation to ***both*** the accused products and multiple prior art references without hesitation or caveat. The ability of both technical experts to apply this claim term in a variety of different contexts without any hesitation or uncertainty demonstrates that these claims are not indefinite.

2.      The Term Visually Negligible Was Central To Prior Reexamination Proceedings

The prior reexamination proceedings provide additional support for this conclusion. The issue of indefiniteness never arose during the original prosecution

of the '845 patent, or in either of the two subsequent reexaminations. Moreover, application of the visually negligible claim limitations to the prior art was central to the arguments in the second reexamination.

In response to a rejection, Sonix presented expert testimony and argument that the proposed combination of the *Lamoure* and *Priddy* references would result in a graphical indicator that was not "visually negligible." A2329. Thus, the examiners conducting the reexamination had to apply the "visually negligible" claim limitation to a hypothetical combination of prior art references. The examiners undertook that analysis without any reservation regarding the definiteness, and confirmed the claims based on a finding that "the **critical element** of: *a graphical indicator that is visually negligible* **wherein** *the graphical indicator comprises a header information* is found not to be obvious over the Lamoure, Priddy, and Frazer references." A2364 (emphasis in original).

This second reexamination proceedings again demonstrate that the term "visually negligible" is reasonable certain and can be applied consistently in a variety of contexts.

### C.    The Relevant Art Provides Additional Context for Understanding the Term Visually Negligible

The district court also failed to consider the context provided by other relevant patents in the field. In particular, other dot pattern encoding patents

discuss the importance of using a dot pattern that will have a negligible visual impact on overlapping text and images.

For example, the *Lamoure* reference explains that such a dot pattern must encode information "without detriment to the original image or text." A2420-2428 (col. 2, ll. 14-19)  *Lamoure* then discusses the importance of homogeneity as a factor in avoiding such a visual impact*, particularly maintaining a "substantially isotropic" or even distribution of dots.  *Lamoure* also notes that a low density of dots "contributes to making the location frame [dot pattern] on the map more difficult to see with the naked eye." A2425 (col. 4, ll. 47-66).

U.S. Patent No. 7,770,805 ("the '805 patent"), which describes the GeneralPlus dot pattern technology used in the accused products, also discusses the issue of "visual interference" with overlapping text and images. A4731-4742.  As the '805 patent explains:

> when the code is very small, such as the resolution of 800 DPI, the human eyes may almost feel that the gray levels are the same.  Thus, this code can reach the effect of the constant gray level . . . [Therefore,] this code *cannot cause the visual interference* . . . That is, when this code is used on the printing product, *the information can be hidden therein* and cannot be found.

A4739 (col. 4, ll. 22-30).

These patents confirm that persons of skill in the art understand the problem of "visual interference" and the need for a dot pattern that does not visually interfere with overlapping text and images.  Their discussions of objective criteria

38

relevant to the factors of homogeneity, brightness, and differentiation confirm that persons skilled in the art understand the characteristics that affect the visual impact of a dot pattern such as dot size, resolution, density, and distribution, and are capable of determining whether or not a particular dot pattern is "visually negligible."

These other patents are further evidence that claim limitations requiring "visually negligible" graphical indicators in the '845 patent are reasonably certain to those of ordinary skill in the art.

### D. Defendants-Appellees Failed to Meet Their Burden of Proving Invalidity by Clear and Convincing Evidence, and the District Court Erred in Failing to Properly Consider the Claims in the Context of the Intrinsic and Extrinsic Evidence.

While acknowledging that "[t]he party alleging indefiniteness under Section 112 must prove by clear and convincing evidence that the challenged claims of the patent are indefinite," the district court failed to apply this standard. A24 (citing *Nautilus*, 134 S. Ct. at 2130, n.10; 35 U.S.C. § 282(a)). As discussed above, the specification provides criteria and examples that assure that persons of skill in the art understand the scope of the term "visually negligible" with reasonable certainty. *See Thought, Inc.*, 2014 U.S. Dist. LEXIS 150127, at *34 ("words of degree" not indefinite where the specification provides context). The application of the "visually negligible" limitation to both the accused products and prior art by

both parties' experts, the reexamination proceedings, and the teachings of other relevant patents confirms that the claims are sufficiently definite.

In its search for a mathematically precise, numeric standard, the district court failed to understand the context provided by the specification, misunderstood the expert testimony, and failed to hold Defendants-Appellees to their high burden of proof to invalidate the '845 patent.

### 1.    The Intrinsic Evidence Confirms That the Claims are Definite

The district court's analysis failed recognize the detailed factors and objective criteria provided in the specification.  The specification describes objective criteria for evaluating the differentiability, homogeneity, and brightness factors that affect the visual impact of a dot pattern on the main information, including the shape, size, arrangement, number, and density of dots in the graphical indicators.  As explained in the specification, these factors impact human perception of the graphical indicators, and provide exactly the type of objective standard required to assure consistent application of the claims. In treating "visually negligible" as an aesthetic opinion rather than a term of degree involving human perception, the district court ignored the teachings of the specification.  The specification and file history do not provide clear and convincing evidence that the term "visually negligible" is indefinite.

### 2.    The Extrinsic Evidence Supports and Further Confirms that the Claims are Definite

40

The district court's handling of the extrinsic evidence begins with its declaration that the extrinsic evidence is "not necessary for the Court's consideration here." A35. Nevertheless, the district court immediately discusses and appears to rely on certain extrinsic evidence, while ignoring other important extrinsic evidence. In particular, the district relied on its finding that Dr. Ashok and Dr. Engels "disagree in their ultimate opinions" regarding whether the prior art *Lamoure* reference discloses a "visually negligible" dot pattern. A35. From this, the district court concluded that the two experts disagreed in their application of the "visually negligible" limitation to *Lamoure,* confirming the "subjective application" of the term in practice. A40. Yet, the evidence establishes that both experts ***agreed*** that *Lamoure* discloses a "visually negligible" dot pattern. A3087-3088, A4210-4211 (¶ 144). As Dr. Ashok put it at his deposition, *Lamoure* "doesn't want these dot codes to be visually apparent." A4772 [115:24-117:14].

To the extent that the district court made a factual finding, it erred in not construing the facts in the light most favorable to Sonix, as the non-moving party on summary judgment. Moreover, even if the court had correctly understood the evidence, a dispute between experts on whether a prior art reference satisfies a claim limitation does not render that term indefinite.

The other available evidence, including the testimony of both experts consistently applying the "visually negligible" claim limitation to the accused

41

products and the prior art, Dr. Engels testimony regarding specific aspects of the prior art that rendered it "visually negligible and explaining how to "easily" create a dot pattern that is "visually negligible," application of the "visually negligible" limitation to the prior art during reexamination, and the teachings and examples in other relevant patents all provide clear and convincing evidence that the "visually negligible" claim limitation is reasonably certain to persons of skill in the art.

### 3.    Defendants-Appellees Have Not Met Their Burden of Proving Invalidity by Clear and Convincing Evidence

While Dr. Ashok and Dr. Engels both testified that the "visually negligible" limitation is subjective and there is no numeric standard for measuring visual impact, neither expert has testified that this claim limitation is not reasonably certain or that it cannot be consistently applied.  This Court has consistently recognized that terms of degree are subjective.  Despite this, terms of degree are not inherently indefinite and "absolute or mathematical precision is not required" of such claim limitations.  *Interval Licensing LLC,* 766 F.3dat 1370.  So long as the claims, when viewed in light of the specification and prosecution history, provide "objective boundaries" for those of skill in the art, the claims are not indefinite.  *Id.* at 1371.

The district court never found that Defendants had met their burden of proving invalidity by clear and convincing evidence.  In fact, Defendants did not present any evidence proving that the claims of the '845 patent are indefinite.

42

Rather they simply asserted that this claim limitation was subjective on its face. This bare allegation is confronted with extensive intrinsic and extrinsic evidence, clearly establishing that the "visually negligible" claim limitations are reasonably certain to a person of skill in the art. The district court erred in finding the asserted claims indefinite as a matter of law.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF INDEFINITENESS BECAUSE IT FAILED TO INDIVIDUALLY CONSIDER EACH ASSERTED CLAIM

As an independent ground for reversal, the district court also erred in failing to give proper consideration to each individual dependent claim. Rather than considering the term "visually negligible" in the context of each individual claim, the district court made a general finding that the claim term is indefinite, then simply held that "the '845 patent is invalid for indefiniteness." A42. This failure to consider each claim independently is grounds for reversal.

### A. The District Court Erred in Determining That the Patents-In-Suit Were Indefinite Based on the Presence of the Term Visually Negligible Without Independently Considering Each Claim

"Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." 35 U.S.C. § 282(a); *see Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (Fed. Cir. 1985) ("each claim of a

patent is entitled to a presumption of validity and is to be treated as a complete and independent invention"). This reflects the fact that "[e]ach claim must be considered as defining a separate invention." *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984); *see Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1993) ("each claim is a separate statement of the patented invention"). Thus, in considering an invalidity argument, the court must give consideration to each claim. See *Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935) (the claims define the invention, and "each claim must stand or fall, as itself sufficiently defining invention, independently of the others.") (citations omitted).

Here, the district court erred in failing to give independent consideration to each asserted claim. While the district court notes that "[a]ll of the claims currently at issue — Claims 9, 25, 35-36, 52-55, 57-60, 62-64, 66, 68, 71-77, 79-82, 85-90 — require a 'graphical indicator' to be 'visually negligible,'" it never undertakes an analysis of any specific, individual claim. A25. Rather than evaluating the validity of each claim – or even a single specific claim – the district court simply found "the term 'visually negligible' indefinite" and granted summary judgment that "the '845 Patent is invalid for indefiniteness" on that basis. A42. By evaluating the term "visually negligible" in the abstract, the district court erred as a matter of law.

44

## B.    Dependent Claims 60 and 77 Include Objective Requirements that Render them Reasonably Certain

The district court's failure to independently evaluate each claim is particularly problematic with respect to dependent claims 60 and 77. Both of these claims include specific, objective, numeric requirements reflecting exemplary embodiments from the specification that meet the visually negligible claim limitation. Thus, even if this Court finds that claims using the term "visually negligible" alone are indefinite, dependent claims 60 and 77 include additional limitations that establish render them reasonably certain.

Specifically, claims 60 and 77 incorporate as claim limitations the state zone and dot density limitations provided in the exemplary embodiments for visually negligible graphical indicators. Both claims expressly require that: (1) each square centimeter of the selected zone includes more than 3000 state zones; (2) of which less than seventy percent are in the first state, and (3) the percentage of area occupied by the graphical micro-unit in the state zone is less than 80. A95-96 (col. 2, ll. 8-12; col. 3, ll. 29-33). These claim limitations reflect the first exemplary embodiment for "graphical indicators being negligible to human eyes," and thus include objective, numeric limitations for a visually negligible graphical indicator.

At oral argument on summary judgment Sonix pointed out these unique features of dependent claims 60 and 77. In its opinion, the district court noted this issue in a footnote, but stated that it "does not consider these arguments here."

45

A31.  The district court then continued, indicating that "if the Court did consider Sonix's arguments, however, it finds the dependent claims to which Sonix referred (Claims 60 and 77) do not provide guidance for the limitations of the scope of 'visually negligible' because while they may provide limitations for the number of state zones or percentage of area occupied by the graphical micro-unit in the examples covered by those claims, they do not provide the person of ordinary skill with reasonable certainty as to the edges of the broader scope for those parameters in the independent claims which embody scope outside of the specified limitations of the dependent claims."  *Id.*  The district court's analysis conflates independent consideration of dependent claims 60 and 77 with the separate issue of whether the limitations in those dependent claims provide context that renders the broader independent claims valid.

The district court cannot ignore its clear mandate to independently evaluate each claim on its own merits.  Here, the district court did not directly address the validity of the dependent claims, instead finding them invalid solely because they depend from independent claims that have the "visually negligible" term.  Exercising its *de novo* review, this Court must give independent consideration to each asserted claim.

Dependent claims 60 and 77 provide specific, objective, numeric standards that must be met to fulfill the visually negligible  claim limitation.  Thus, even if

the claims that lack these specific limitations are found to be indefinite, the additional limitations in claims 60 and 77 establish render those claims far more than "reasonably certain."

## CONCLUSION

The judgment below should be reversed, and this case remanded for further proceedings.

Dated: March 28, 2016                    Respectfully submitted,

                                         By: /s/ Jonathan Hangartner
                                              Jonathan Hangartner
                                              X-Patents, APC
                                              5670 La Jolla Boulevard,
                                              La Jolla, CA 92037
                                              Telephone: (858) 454-4313
                                              Facsimile: (858) 454-4314
                                              jon@x-patents.com


                                         *Attorneys for Plaintiff-Appellant*

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing Brief for Plaintiff-Appellant complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(b). The brief was printed using 14-point Times New Roman font. The word-processing system used to prepare the document, excluding the Table of Contents, Table of Authorities, and Certificate of Interest, calculates that it contains 11,636 words.


/s/Jonathan Hangartner
Jonathan Hangartner

**ADDENDUM**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

SONIX TECHNOLOGY CO., LTD.,

Plaintiff(s),

v.

PUBLICATIONS INTERNATIONAL, LTD.,
SD-X INTERACTIVE, INC.,
ENCYCLOPAEDIA BRITANNICA, INC., and
HERFF JONES, INC.,

Defendant(s).

Case No.  13-cv-2082
Judge Amy J. St. Eve

## AMENDED JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $           ,

which ☐ includes           pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: Defendants' motion for summary judgment that the '845 Patent is invalid for indefiniteness is granted and Defendants' motion for summary judgment regarding noninfringement and pre-suit damages is denied as moot.  Defendants' affirmative defense and counterclaim of invalidity is granted and Defendants' counterclaim of non-infringement is dismissed as moot.  Plaintiff's claims for infringement of the '845 Patent and alter ego liability are dismissed as moot.

---

This action was *(check one)*:

☐ tried by a jury with Judge       presiding, and the jury has rendered a verdict.
☐ tried by Judge       without a jury and the above decision was reached.
☒ decided by Judge Amy J. St. Eve on a motion for summary judgment.

Date:   12/8/2015                                  Thomas G. Bruton, Clerk of Court

                                                     Katie Franc, Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SONIX TECHNOLOGY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-2082 |
| | ) | |
| PUBLICATIONS INTERNATIONAL, LTD., | ) | |
| SD-X INTERACTIVE, INC., | ) | |
| ENCYCLOPAEDIA BRITANNICA, INC., and | ) | |
| HERFF JONES, INC. , | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendants Publications International, Ltd. ("PIL"), SD-X Interactive, Inc. ("SD-X"),

Encyclopaedia Britannica, Inc. ("Britannica"), and Herff Jones, Inc. ("Herff Jones"),

(collectively, "Defendants") have moved for summary judgment pursuant to Federal Rule of

Civil Procedure 56 regarding Plaintiff Sonix Technology Co, Ltd.'s, ("Sonix's") allegation of

infringement; the definiteness of the U.S. Patent No. 7,328,845("the '845 Patent") claim term

"visually negligible"; and pre-suit damages.  (*See* R.156.)  For the following reasons, the Court

grants in part and denies in part Defendants' summary judgment motion.

### BACKGROUND

### I.      Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court,

'which does not have the advantage of the parties' familiarity with the record and often cannot

afford to spend the time combing the record to locate the relevant information,' in determining

whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting

*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009) (quoting L.R. 56.1(a)(3)). The nonmoving party must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (quoting L.R. 56.1(b)(3)(B)). The nonmoving party also may submit a separate statement of additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon to support those facts. *See* L.R. 56.1 (b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

The purpose of Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (finding Rule 56.1 statements incompliant when they fail to adequately cite the record and are filled with irrelevant information, legal arguments, and conjecture.") The Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809-810) (7th Cir. 2005.) Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). "[D]istrict courts are entitled to expect strict compliance with Local Rule 56.1." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006).

Defendants assert that many of Sonix's responses to Defendants' Rule 56.1 Statement of Facts are improper under Rule 56.1 and insufficient to establish genuine issues of material fact. In particular, Defendants argue that many of Sonix's responses are unsupported or unresponsive. Regarding paragraph 10, Defendants rely on their Initial Non-infringement and Invalidity Contentions in support of the statement that even though Defendants sold the Accused Products, they did not know how the dot pattern technology—created and assembled from GeneralPlus— worked. (R.189, ¶ 10.) As Defendants point out in other arguments, however, pursuant to the Local Patent Rules, Initial Non-infringement and Invalidity Contentions are inadmissible as evidence on the merits. (*See* LPR. 1.6, Admissibility of Disclosures.) As such, Defendants' objection to Sonix's response to this statement of fact is moot as the Court cannot consider the underlying statement for the purposes of summary judgment. *See Knowles Elecs., LLC v. Analog Devices, Inc.*, 2012 WL 1405745, at *2, n.1 (N.D. Ill. 2012) (*citing* LPR 1.6) (recognizing that initial disclosures are not admissible "as evidence on the merits" while considering the disclosure for the limited purposes of jurisdiction as representative of plaintiff's allegation of infringement). Regarding paragraph 20, Defendants rely on Sonix's Final Infringement Contentions and assert that Sonix limited its infringement claims to literal infringement. (R.189, ¶ 35.) Sonix responds, without citing any evidence, that it reserved its right to assert the doctrine of equivalents "to the extent that information gathered through discovery necessitates the assertion of [the doctrine]." (R.189, ¶ 35, Sonix's Response.) Because Sonix fails to cite evidentiary support and because fact discovery has closed in the present case, the Court treats this statement as admitted. *See* Local Rule 56.1(b)(3)(C); *Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) (explaining that the Court may also disregard statements and responses that do not properly cite to the record). Sonix also responds to many

3

statements as irrelevant without citing supporting portions of the record (*see* R.189, ¶¶ 11-13, 15-16, 20), these facts are deemed admitted. The Court further disregards Sonix's statements that fail to provide evidentiary support for specific portions or that consist of legal argument. *See* N.D. Ill. L.R. 56.1(b)(3)(C); *see also Tan v. City of Chicago*, No. 00 C 1470, 201 WL 1012586, at *2 (N.D. Ill. Aug. 30, 2001) (ignoring statements unsupported by specific citations to the material relied upon).

Turning to Plaintiff's Statement of Facts, Sonix failed to comply with the obligation under Local Rule 56.1 for the statement of additional facts to consist of "*short* numbered paragraphs." *See* L.R. 56.1(b)(3)(C) (emphasis added). Sonix's statements contain several sentences, and consist of lengthy paragraphs that are, in at least one case, more than a page long. (*See* R.189, Stmt. of Addt'l Facts, ¶ 2.) Sonix's blatant non-compliance with both the letter and spirit of Local Rule 56.1 has substantially increased the Court's burden in resolving the pending motions.

## II. The Parties' Objections to Declarations

In addition to the above objections to the Rule 56.1 statement of facts, Sonix objects to the declaration from Ben Wang, an algorithm engineer at GeneralPlus Technology Inc., Taiwan ("Wang Declaration"), submitted in support of summary judgment and Defendants object to the declaration from Dr. Amit Ashok, Sonix's invalidity and infringement expert ("Ashok Declaration"), submitted in support of Sonix's opposition to summary judgment.

### A. Wang Declaration

The Court previously addressed the Wang Declaration when it granted in part Defendants' motion for leave to amend their final non-infringement and invalidity contentions.

(*See* R.170.)[1]  Indeed, in that opinion, the Court addressed any potential prejudice to Sonix when it ruled that—despite Sonix's earlier failures to pursue discovery from GeneralPlus at any point in the litigation after repeatedly being directed there by Defendants—the Wang Declaration's late timing warranted an opportunity for Sonix to depose Mr. Wang.  In doing so, the Court stated that it would not consider the Wang Declaration in connection with Defendants' summary judgment motion unless Defendants produced Mr. Wang for a deposition and provided any discoverable materials he relied upon in rendering his declaration.  (*See* R.170, at 13.)  Although Mr. Wang did not produce any materials considered—claiming that he relied only on his personal knowledge—he did sit for a deposition in Taipei, Taiwan on September 4, 2015. (R.174-2; R.190.)

Sonix repeatedly relies on the Wang Declaration in support of its opposition to summary judgment.  (*See e.g.,* R.188, at 6, 9, 10, 12-13, 20; R.189, Stmt. of Addt'l Facts, ¶¶ 4, 6-15; *see also* R.189, Sonix's Responses to Defs'. Stmt. of Facts, ¶ 66 (objecting to the Wang Declaration); *id.*, ¶ 67 (relying on the Wang Declaration's disclosure that a dot pattern scheme in the products is found in the '805 Patent).)  Despite this repeated reliance, however, Sonix objects to Defendants' submission of the Wang Declaration as "untimely expert opinion" in a short perfunctory paragraph.  Sonix fails, however, to provide argument or analysis in support of its assertion that Mr. Wang is being presented as an expert and instead eludes to Defendants submission of the Wang Declaration as improper since it resulted in Sonix only becoming aware of GeneralPlus' testimony after the close of fact discovery and at this late stage of the litigation. (*See* R.188, at 20.)  Putting aside the fact that the Court has already addressed this argument, it is

---

[1] In ruling on Defendants' Summary Judgment Motion (R.155) and Sonix's Motion for Leave to Amend Final Infringement Contentions (R.200), the Court presumes familiarity with its Opinion and Order entered on Aug. 10, 2015 granting in part Defendants' Motion for Leave to Amend their Non-Infringement and Invalidity Contentions in Light of New Evidence (R.152).  (*See* R.169; R.170.)

5

equally unpersuasive here, given that Sonix has known since at least November 23, 2013,[2] that at least some of the accused products incorporate GeneralPlus' technology and the Court provided Sonix the opportunity to depose Mr. Wang after Defendants' submitted his declaration.

Sonix further objects to the Wang Declaration based upon "Defendants' failure to cause GeneralPlus to produce a single record relied upon by Mr. Wang in direct violation of the Court's August 10, 2015 Order requiring Defendants to produce Mr. Wang for deposition and produce supporting records." (*See* R.188, at 20.) The Court already addressed this issue, however, in denying Sonix's motion relating to the deposition of Mr. Wang (R.172) based on GeneralPlus' representation that Mr. Wang's declaration "is based on his own personal knowledge, nothing else." (*See* R.175; R.174-2.) Again, Sonix fails to cite to its statement of facts or to provide the Court with evidence that Mr. Wang indeed relied on documents outside of his personal knowledge, nor does Sonix provide any argument as to why Mr. Wang's personal knowledge is insufficient to support the testimony he offers.

Lastly, Sonix argues that it did not have a meaningful opportunity to depose Mr. Wang at his deposition due to instructions not to answer questions regarding "how the GeneralPlus software actually decodes the dot pattern structure in the accused products." (*See* R.188, at 20.)[3]

---

[2] Defendants served their Initial Noninfringement Contentions on November 23, 2013 which state "[o]thers of the products identified by [Sonix's Initial Infringement Contentions] incorporate the technology … patented by U.S. Patent No. 7,770,805 issued to General[P]lus Technology Inc. Defendants import, sell, and offer for sale those products pursuant to a license from [GeneralPlus]." (R.153-2, Defs. Initial Noninfringement Contentions, Ex. 2, at 4; R.170, at 3.)

[3] The Court denied Sonix's earlier motion for relief relating to the deposition of Mr. Wang and in doing so, reemphasized the narrow scope of its ruling pertaining to Mr. Wang's deposition and indicated that its ruling did not allow Sonix to pursue all discoverable materials that it had failed to pursue during discovery. (R.177, Hrg. Tr., Aug. 31, 2015, at 6:10-7:2 (explaining that the Court's order did not allow Sonix to get all discoverable materials and that it had a "very narrow" scope).) The Court further informed Sonix that "if the deposition goes forward and they did not produce documents or it cannot be an effective deposition because they do not have certain documents, then I will consider that in the context of the motion to strike." (*Id.*, at 5:9-12.)

6

Sonix generally cites to the 200-page deposition transcript and alleges that counsel gave "over 40 instructions" not to answer, but Sonix does not provide argument or analysis of specific examples, nor does it explain how counsel's conduct at the deposition or how Sonix's lack of documents Mr. Wang relied upon rendered their opportunity to depose him—on the limited topics allowed by the Court—less meaningful. (*See* R.188, at 20 (*citing* R.184, ¶¶ 2, 3); R.189, ¶¶ 66.) Accordingly, because the Court made Mr. Wang available for a deposition and Sonix has not demonstrated otherwise, the Court denies Sonix's objection to the Wang Declaration.[4]

### B.       Ashok Declaration

Defendants raise a separate threshold evidentiary issue regarding Sonix's response to Defendants' summary judgment motion. Namely, Defendants object to Sonix's submission of the Ashok Declaration and ask the Court to strike the declaration because it contains new information and is untimely. The Court agrees.

Sonix filed the Ashok Declaration in connection with its response to Defendants' summary judgment motion and in particular, in response to the Wang Declaration. In preparing the declaration, Sonix specifically asked Dr. Ashok to review Defendants' summary judgment motion, the Wang Declaration, the transcript of Mr. Wang's deposition, and the U.S. Patent No. 7,770,805 ("the '805 Patent") referenced by Mr. Wang both in his declaration and at his deposition. (R.183, ¶ 4.) After doing so, Dr. Ashok provided his declaration which considers new evidence not disclosed in his earlier expert reports and ultimately affirms his earlier infringement opinions. (*See* R.183, Ashok Decl.; R.184-3, Ex. D, Ashok Op. Expert Report; R.184-4, Ex. E, Ashok Rebuttal Expert Report.) Indeed, Sonix admits that Dr. Ashok presents

---

[4] Although the Court does not ultimately rely on the Wang Declaration in its determination that the '845 Patent is invalid for indefiniteness, *see supra* Analysis, Section I, the discussion of the issues provides an understanding of the evidentiary landscape before the Court.

supplemental opinions and new bases for his opinions in the Ashok Declaration that did not exist in his original expert report. (*See* R.201, at 5 ("Sonix seeks to amend its infringement contentions to: (i) clearly conform to the new evidence produced by Defendants in Mr. Wang's declaration and deposition testimony as well as Dr. Ashok's supplemental opinions expressed in his declaration in opposition to summary judgment"); *id*., at 6 ("Once Mr. Wang's declaration was filed, Sonix promptly sought and obtained an opportunity to depose Mr. Wang, took his deposition in Taiwan, and worked with its expert to supplement his opinions in view of this new evidence as reflected in Dr. Ashok's declaration filed on September 23, 2015").)

Expert disclosures and testimony are governed by Federal Rule of Civil Procedure 26(a)(2). The rule states that the disclosed expert must prepare and sign a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them. Fed. R. Civ. P. 26(a)(2)(B). Rule 26(e) requires litigants to supplement expert disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e). For experts like Dr. Ashok—that are required to submit a report under Rule 26(a)(2)(B)—this "duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). In addition, the duty to supplement does not encourage abuse and "does not provide an opening for wholly new opinions." *See Rowe Int'l Corp. v. Ecast, Inc.*, 586 F.Supp.2d 924, 933, n.1 (N.D. Ill. 2008) (citations omitted).

Federal Rule of Civil Procedure 37 provides a "safety-valve provision" for the additional information required by Rule 26(a) or (e) that allows a party to admit the information when it is "substantially justified or is harmless". *See Rowe Int'l Corp.*, 586 F.Supp.2d at 934-35 (*citing*

Fed. R. Civ. P. 37(c)(1)).  The Court has discretion in evaluating the four interrelated factors

pertinent to this issue: "(1) the prejudice or surprise to the party against whom the evidence is

offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the

trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier

date."  *Ballard v. Zimmer, Inc.*, No. 11 C 6786, 2015 WL 110146, at *5 (N.D. Ill. Jan. 7, 2015)

(*citing Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012), *as amended* (Feb. 2, 2012));

*David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003).

     The challenges presented by the Ashok Declaration and its connection to the underlying

Wang Declaration ultimately stem from Sonix's failure to obtain discovery from GeneralPlus

and its—likely related—failure to provide Defendants with clarity regarding Sonix's

infringement positions disclosed in initial and final contentions.  The Court first dealt with the

impact of Sonix's inaction when it granted in part Defendants' motion for leave to amend their

noninfringement contentions based on the new information Dr. Ashok provided during his July

15, 2015 deposition.  (*See* R.170.)  The Court granted Defendants' motion, conditioned in part on

the production of Mr. Wang, and all discoverable materials upon which he relied, for a

deposition limited to the scope of his declaration.  The Court did not, however, grant Sonix's

related requests to "reopen discovery and fully develop its own evidence including expert

opinion testimony" on the invalidity issue, nor did it grant Sonix's request to "reopen discovery

regarding the operation of the accused products and further explore the information available to

Defendants from GeneralPlus" on the infringement issue.  (*See* R.164, at 12, 14.)  Indeed, the

Court repeatedly told Sonix that Defendants' provision of Mr. Wang for a deposition was not an

opportunity for Sonix to reopen discovery.[5]  (*See* R.177, Motion Hrg. Tr., Sept. 2, 2015, 6:12-16

---

[5] Sonix admits that it took no independent steps during the present litigation to obtain foreign
discovery from GeneralPlus, even though Sonix knew that GeneralPlus was a direct competitor with

("You made a decision, either intentionally or unintentionally, not to pursue discovery from [GeneralPlus]. And this is not opening up discovery from them. You did not pursue anything against GeneralPlus, for whatever reasons. This is not the opportunity to do so"); *id.*, 6:25-7:2 ("I am not opening up discovery now for you to pursue everything against GeneralPlus that you did not pursue in the first instance"); *id.*, 7:18-19 (The Court: "…this is not the opportunity to reopen discovery that you did not pursue in the first instance").

Sonix did not front the issue and the Court, therefore, did not contemplate the Ashok Declaration and its supplemental expert testimony in its order in granting limited discovery to Sonix based on the Wang Declaration. Indeed, prior to filing the Ashok Declaration, Sonix did not move for leave to do so under the Local Patent Rules or under Federal Rule of Civil Procedure 26(a), and on this basis alone, the Court could strike the Ashok Declaration. *See e.g., Carter v. Finely Hosp.*, No. 01 C 50468, 2003 WL 22232844, at *1 (N.D. Ill. Sept. 22, 2003) (holding defendant violated Rule 26(a) by disclosing supplemental expert opinions after the close of discovery and granting plaintiff's motion to strike the opinion). Instead, Sonix surprised Defendants by simply filing its expert declaration along with its opposition to summary judgment. Defendants would suffer prejudice by the admission of the Ashok Declaration at this late stage. Defendants have not had an opportunity to depose Dr. Ashok on the new bases for his infringement opinions. The only cure for such prejudice calls upon the Court to do explicitly what it has told the parties it will not—reopen discovery. This is especially true here, where Dr. Ashok provides testimony on the '805 Patent and how its disclosure relates to the Accused Products and in order to address the prejudice, Defendants would not only need to depose Dr.

---

knowledge of the Accused Products and was located in a foreign country outside of the Court's subpoena power. (*See* R.171, Motion Hrg. Tr., Aug. 12, 2015, 12:10-23; Stmt. of Undisputed Facts, ¶¶ 35, 36.)

Ashok, but also provide rebuttal reports from their own experts, beginning a cycle that essentially asks for fact and expert discovery to begin anew. Sonix, as the patentee, has the burden to prove infringement and, therefore, it is Sonix who bears the responsibility for not obtaining the desired GeneralPlus information during discovery. *See Exigent Tech., Inc. v. Atrana Sol., Inc.*, 442 F.3d 1301, 1307-08 (Fed. Cir. 2006) (explaining that it is the patentee who bears the burden of proof regarding infringement). For these reasons, the Court finds that supplementation of Dr. Ashok's report by way of the Ashok Declaration is not "substantially justified" or "harmless" under Rule 26(a) or (e) and the Court, therefore, grants Defendants' request to strike the Ashok Declaration.

In addition, Local Patent Rule 5.3, provides: "[a]mendments or supplementation to expert reports after the deadlines provided herein are presumptively prejudicial and shall not be allowed absent prior leave of court upon a showing of good cause that the amendment or supplementation could not reasonably have been made earlier and that the opposing party is not unfairly prejudiced." LPR 5.3. "The Rule provides for a presumption against supplementation of expert reports after the deadlines." *See Sloan Valve Co. v. Zurn Indus., Inc.*, No. 10 C 204, 2013 WL 3147349, at *2 (N.D. Ill. June 19, 2013); *see also Kruse Tech. P'ship v. Volkswagen AG,* 544 Fed. Appx. 943, 953–54 (Fed. Cir. 2013) (explaining that the Federal Circuit defers to the district court when interpreting and enforcing local rules "so as not to frustrate local attempts to manage patent cases according to prescribed guidelines").

Although Sonix did not file a motion for leave to supplement Dr. Ashok's opinions and reports in this case, the analysis under Local Patent Rule 5.3 is relevant to the issues before the Court. In addition to the fact that Sonix did not seek leave of Court to submit the Ashok Declaration, its admission at this stage, as discussed above, unfairly prejudices Defendants and

provides them no recourse to respond. Furthermore, although Defendants first disclosed the Wang Declaration—to which the Ashok Declaration responds—during summary judgment, the Court does not find that the Ashok Declaration "could not reasonably have been made earlier". *See* LPR 5.3 (requiring a showing of good cause that the amendment or supplementation could not reasonably have been made earlier). The essence of the information disclosed in the Wang Declaration is the information regarding the function of the Accused Products—information that Sonix knew belonged to GeneralPlus, yet failed to independently pursue during discovery. The primary rationale for excluding untimely expert opinions is to avoid an unfair "ambush" in which a party advances new theories or evidence to which its opponent has insufficient time to formulate a response. *See Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 742 (7th Cir. 1998);[6] *see also Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230–31 (7th Cir. 1996) (experts' new charts "disclosed only a few days before the start of the trial would have placed on [the opponent] a heavy burden of meeting the new evidence at trial with its own experts' analysis"). Accordingly, the Court grants Defendants' motion to strike the Ashok Declaration and does not consider it for the purposes of summary judgment.[7]

## III.    Relevant Facts

### A.    The Parties

Sonix is a company organized and existing under the laws of the country of Taiwan, having a principal place of business in Chupei City, Hsinchu, Taiwan. (Stmt. of Undisputed

---

[6] Although the substantive law of the Federal Circuit applies to the patent issues in this case, the Court applies the Seventh Circuit precedent to procedural issues not unique to patent law. *See Vanguard Research, Inc. v. PEAT, Inc.,* 304 F.3d 1249, 1254 (Fed. Cir. 2002); *Wexell v. Komar Indus., Inc.,* 18 F.3d 916, 919 (Fed. Cir. 1994).

[7] Although the Court does not ultimately rely on the Wang Declaration in its determination that the '845 Patent is invalid for indefiniteness, the discussion of the issues it presents provides an understanding of the evidentiary landscape with which the Court dealt.

Facts, ¶ 3.)[8]  Sonix manufactures integrated circuits and related products in Taiwan.  (Stmt. of

Addt'l Undisputed Facts, ¶ 16.)[9]  Sonix manufactures and sells integrated circuits and related

products that use its patented dot decoding technology (referred to as "Chipsets") exclusively to

independent distributors in Hong Kong.  (Id.)

Defendant PIL is a corporation organized and existing under the laws of the State of

Illinois, having its principal place of business in Lincolnwood, Illinois.  (Id., ¶ 4.)  Defendant

SD-X is a corporation organized and existing under the laws of the State of Delaware, having its

principal place of business in Lincolnwood, Illinois.  (Id., ¶ 5.)  Defendant Britannica is a

corporation organized and existing under the laws of the State of Delaware, having its principal

place of business in Chicago, Illinois (Id., ¶ 6.)  Defendant Herff Jones is a corporation organized

and existing under the laws of the State of Indiana, having its principal place of business in

Indianapolis, Indiana, and doing business within this Judicial District.  (Id., ¶ 7.)  The Court has

subject matter jurisdiction over Sonix's patent claims under 28 U.S.C. §§ 1331 and 1338, and

venue is proper in this District pursuant to 28 U.S.C. §§ 1400(b) and 1391(c).  (Id., ¶ 8.)

### B.    The '845 Patent

The '845 Patent, entitled "Method for Producing Indicators and Processing Apparatus

and System Utilizing the Indicators," issued on February 12, 2008.  (R.91-1, '845 Patent, at

JA19.)  The '845 Patent is directed to the use of graphical indicators affixed to the surface of an

---

[8] Citations to "Stmt. of Undisputed Facts" refer collectively to Defendants' Local Rule 56.1 Statement of Facts (R.157) and Plaintiff's Responses (R.189).  For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed or admitted.  "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements.  When we cite as undisputed a statement of fact that a party has attempted to disputed, that reflects our determination that the evidence does not show that the fact is in genuine dispute."  Zitzka v. Vill. of Westmont, 743 F.Supp.2d 887, 897 (N.D. Ill. 2010).

[9] Citations to "Stmt. of Addt'l Undisputed Facts" refer collectively to Plaintiff's Local Rule 56.1 Statement of Additional Facts (R.189) and Defendants' Responses (R.198).  For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed or admitted.

object and negligible to the human eye that provide information, beyond the visual text and images on the object's surface, that is retrievable through an electronic system. (*Id.,* at JA1, abstract.) The specification describes a method for producing visually negligible dot patterns – referred to as "graphical indicators" – affixed to a surface (e.g., the page of a book), that overlap and co-exist, but do not interfere, with the main information on the surface of the object (e.g., visual text and images). (*See id.,* at JA19, col.2:55 – JA20, col.3:3.) As issued, the '845 Patent contained 51 claims generally directed to a processing system (Claims 1-32), an electronic apparatus (Claims 33-41), an image processing circuit (Claim 42), and a coordinate positioning system (Claims 43-51). (*See id.,* at JA23-26.)

The '845 Patent was the subject of two ex parte reexamination procedures with the United States Patent and Trademark Office ("PTO"), resulting in the issuance of Ex Parte Reexamination Certificates. (*See* Stmt. of Undisputed Facts, ¶¶ 11-17; R.91-1, at JA27-31; *see also* R.49, ¶ 13.) On January 19, 2011, Sunplus Technology Co., Ltd., ("Sunplus") submitted a Request for Ex Parte Rexamination of Claims 1-51 of the '845 Patent to the PTO, alleging that a substantial new question of patentability existed. (Stmt. of Undisputed Facts, ¶ 11; *see also* R.92-1, at JA543; R.92-2, at JA89.) The PTO granted Sunplus's request for ex parte reexamination. (*Id.*) In an Office Action mailed on April 14, 2011, the examiner rejected claims 1-5, 10, 14, 16-21, 26, 29, 31, 32, and 43-44 and confirmed the patentability of claims 15 and 39. (Stmt. of Undisputed Facts, ¶ 12; R.95-1, at JA1434.) Specifically, the PTO rejected claims 1-5, 10, 14, 16-21, 26, 29, 31, 32, and 43-44 under 35 U.S.C. § 102(b) as being unpatentable over either a Canadian patent, CA 2 374 808 ("Fahraeus") alone or in view of various combinations with U.S. Patent No. 4, 604,065 ("Frazier"), U.S. Patent No. 4,869,532 ("Abe"), and/or U.S. Patent No. 5,866,895 ("Fukuda '895"). (Stmt. of Undisputed Facts, ¶ 12; R.95-1, at JA1444-46.)

14

The PTO interpreted Fahraeus as disclosing, among other things, a graphical indicator that is "visually negligible" and "a processing device that receives the image, processes the image and retrieves the graphical indicator from the image." (Stmt. of Undisputed Facts, ¶ 12; R.95-1, at JA1436-37.) Relying on U.S. Patent No. 5,416,312 ("Lamoure"), the PTO rejected claims 1, 2, 4-8, 13, 14, 17-24, 30-32, 41, 43-45, 50, and 51 under 35 U.S.C. § 102(b) as anticipated by Lamoure. (Stmt. of Undisputed Facts, ¶ 12; R95-1 at JA1444-46.) The PTO also rejected claims 7-9, 12, 22-23, 25, 28, 33, 40, 42, and 46-51 under 35 U.S.C. § 103(a) as being unpatentable over either Lamoure alone or in view of various combinations with Fukuda '250, Fahraeus, and/or Abe. (Stmt. of Undisputed Facts, ¶ 12; R95-1, at JA1447-51.) The PTO issued an Ex Parte Reexamination Certificate for the '845 Patent on December 27, 2011 and confirmed patentability of Claims 9, 15, 25, 35-39, 46-49, and allowed Claims 52-90. (Stmt. of Undisputed Facts, ¶ 14; R.95-3, at JA1670-71.)

On January 26, 2012, GeneralPlus submitted a Request for Ex Parte Reexamination of Claims 9, 15, 25, 35-39, 46-49, and 52-90 of the '845 Patent to the PTO alleging that a substantial new question of patentability existed. (Stmt. of Undisputed Facts, ¶ 15; R.96-1, at JA1673.) In an Office Action mailed on March 19, 2012, the PTO rejected Claims 9, 15, 25, 35-39, 46-49 and 52-90. (Stmt. of Undisputed Facts, ¶ 16; R.97-4, at JA2038.) Specifically, the PTO rejected claims 9, 25, 46, 52-62, 65-67, 69-80, and 84-90 under 35 U.S.C. § 103(a) as being unpatentable under Lamoure and U.S. Patent No. 5,329,107 ("Priddy"). (Stmt. of Undisputed Facts, ¶ 16; R.97-3, at JA2040.) The PTO also rejected Claims 15 and 39 under 35 U.S.C. § 103(a) as being unpatentable over Lamoure and Frazer and Claims 35-38, 47-49, 63, 64, 68, and 81-83 under 35 U.S.C. § 103(a) as being unpatentable over Lamoure, Priddy and Frazer. (Stmt. of Undisputed Facts, ¶ 16; R.97-3, at JA2040-41.) The PTO issued a second Ex Parte

15

Reexamination Certificate for the '845 Patent on December 26, 2012 and confirmed patentability of Claims 9, 15, 25, 35-39, 46-49, and cancelled Claims 15 and 39. (Stmt. of Undisputed Facts, ¶ 17.)

### C. The Dispute

On March 18, 2013, Sonix filed its Complaint against PIL and SD-X, alleging infringement of one or more claims of U.S. Patent No. 7,328,845 ("the '845 Patent"). (Stmt. of Undisputed Facts, ¶ 1; R.1, Compl., ¶¶ 14-18.) On September 17, 2013, Sonix filed its First Amended Complaint naming two additional Defendants, Britannica and Herff Jones, alleging that Defendants infringed one or more claims of the '845 Patent in violation of 35 U.S.C. § 271(a). (Stmt. of Undisputed Facts, ¶ 2; R.49, First Am. Compl., ¶¶ 16-20.) In addition, Sonix alleged that Defendants PIL and SD-X infringed one or more claims of the '845 Patent in violation of 35 U.S.C. § 271(b). (R.49, ¶¶ 21-29.) Sonix also alleged that Defendant PIL was liable as the alter-ego of SD-X for the damages suffered by Sonix. (*Id.*, ¶¶ 30-34.) On October 11, 2013, Defendants filed their Answer, Counterclaims and Affirmative Defenses to Sonix's Complaint. (R.57, PIL's Answer; R.58, SD-X's Answer; R.59, Encyclopaedia Britannica's Answer; R.60, Herff Jones' Answer.) Relevant to this summary judgment motion, Defendants asserted affirmative defenses of non-infringement, invalidity, and damages limitations, and Defendants PIL, SD-X, and Britannica asserted counterclaims of non-infringement and invalidity. (*See generally*, R.57, R.58, R.59, R.60.) The claims of the '845 patent that are currently at issue are Claims 9, 25, 35-36, 52-55, 57-60, 62-64, 66, 68, 71-77, 79-82, 85-90. (Stmt. of Undisputed Facts, ¶ 9.) Sonix has limited its claims of infringement to literal infringement. (*Id.*, ¶ 34.)[10]

---

[10] Sonix's response that this fact is disputed and that it "has reserved its right to rely on the doctrine of equivalents to establish infringement of any asserted claim to the extent that information

### D. Sonix's Lack of Discovery Efforts

Sonix knew as early as 2007-2008 that GeneralPlus provided solutions in the marketplace that competed with Sonix's dot pattern technology. Sonix's 30(b)(6) witness, Ching Fun Pang, testified that Sonix knew as early as 2010 that PIL was considering using GeneralPlus as a vendor for its products and that potential claims of infringement relating to PIL using GeneralPlus as a vendor may exist. (Stmt. of Undisputed Facts, ¶ 35.) In November 2013, Defendants disclosed to Sonix that they imported, sold, or offered for sale, the accused products pursuant to a license from GeneralPlus. (*Id.*, ¶ 36.) In February 2014, during fact discovery, when asked to identify the persons most knowledgeable about how the accused products operated, Defendants advised Sonix that "the persons most knowledgeable to the topics identified in this Interrogatory are employed by GeneralPlus." (*Id.*, ¶ 37.) Defendants again advised Sonix, in October 2014, that GeneralPlus possesses the information regarding the functionality of the technology at issue and stated "it previously identified the persons most knowledgeable to the topics identified in this Interrogatory are employed by GeneralPlus, and that PIL does not have any input into the technology." (*Id.*, ¶ 38.)

Prior to the close of fact and expert discovery, in January 2015, Defendants again disclosed that they expected to elicit testimony from employees of GeneralPlus to support its defenses as Defendants expressly disclosed that employees of GeneralPlus have knowledge

---

gathered through discovery necessitates the assertion of the doctrine of equivalents" is insufficient to create a genuine issue of material fact on summary judgment as the response is unsupported and discovery has closed. In addition, Sonix asserted only literal infringement in its Final Contentions and stated that it "is not presently relying on the doctrine of equivalents to establish infringement of any claim of the patent-in-suit." (R.158-20, Pl.'s Final Infringement Contentions Re: Defendants Britannica and Herff, at 4; R.158-20, Pl.s Final Infringement Contentions Re: Defendants PIL and SD-X, at 7.) Even if Sonix's Motion for Leave to Amend its Infringement Contentions (R.200), filed prior to the Court's ruling on summary judgment, Sonix does not move to amend its contentions to include the doctrine of equivalents and indeed, makes no reference to the doctrine in its motion or supporting arguments.

concerning the function and operation of PIL and SD-X electronic products, including certain POINGO products and dot patterns used in associated books.  (Stmt. of Undisputed Facts, ¶ 39.)  Fact discovery closed on March 2, 2015 (with minor exception for previously-noticed depositions) and all expert discovery closed on July 22, 2015.  (*Id.*, ¶ 40.)  Sonix did not seek discovery from GeneralPlus in this case and did not undertake any investigation to reveal the content of the software, including informally asking GeneralPlus about its source code, investigating GeneralPlus' patent portfolio regarding dot-based technology, attempting to reverse engineer the code, or reviewing any pseudo-code used in the accused products.  (*Id.*, ¶ 63.)  Neither Sonix nor its expert has any information about any pseudo-code or algorithm description for the operation of GeneralPlus products including a dot-based system.  Sonix never sought or obtained "any non-public information about the operation of GeneralPlus['] products with a dot-based system" and Dr. Ashok did not list any source code or other descriptive document of the software functionality in the accused products in his report.  (*Id.*, ¶ 64.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit."  *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find the nonmoving party, there is nothing for a jury to do."  *Bunn*, 753

18

F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)).

In determining whether a genuine issue of material fact exists, the Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Bunn*, 753 F.3d at 682 (citing *Anderson*, 477 U.S. at 255); *see also Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 248 (emphasis in original). In reviewing evidence opposing a motion for summary judgment, courts are not obliged to entertain a "metaphysical doubt." *Matsushita*, 475 U.S. at 586. The Court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). With these standards in mind, the Court addresses Defendants' motion.

## ANALYSIS

### I.   "Visually Negligible" Is Indefinite

Although the parties originally identified the "visually negligible" term as disputed, prior to the Court's claim construction ruling, the parties agreed that the term did not require construction and should be given its ordinary meaning. *See Sonix Tech. Co., Ltd. v. Publications Int'l., Ltd.*, No. 13 C 2082, 2014 WL 5489353, at *10, n.4 (N.D. Ill. Oct. 30, 2014); (Stmt. of Addt'l Undisputed Facts, ¶ 5d). The Court's claim construction ruling, therefore, did not address the "visually negligible" claim term.

Defendants amended their invalidity contentions to assert the indefiniteness of "visually negligible" after Sonix's rebuttal invalidity expert, Dr. Amit Ashok, raised new assertions opining that certain prior art dot patterns failed to meet the claim element because they "tend to make the pattern more noticeable to the reader" and are "visually intrusive". (Stmt. of Undisputed Facts, ¶¶ 20, 21.) Defendants argue that the term "visually negligible" is, by its nature, a term of degree because its scope depends on the desired functional result of some reduced visibility of the graphical indicator. Defendants further contend that a completely invisible dot pattern may be "visually negligible", but above that threshold the scope of the claim term depends on whether an accused "graphical indicator" is sufficiently non-visible to be "visually negligible". The scope of that term, Defendants assert, is therefore ambiguous and lacks an objective standard against which the person of ordinary skill in the art can measure it. Sonix admits that "the term lacks 'a technical standard' and is at least somewhat subjective", but argues that at the same time "the general population would be very close to a standard threshold." (*See* R.188, at 3.) Sonix further asserts that a "visually negligible" graphical indicator refers to something that may be visible, but does not interfere with the user's perception of other visual information on a surface.

## A. Indefiniteness

The Patent Act requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2 (2006 ed.).[11] A patent claim is invalid for indefiniteness if

---

[11] The America Invents Act ("AIA") replaced 35 U.S.C. § 112, ¶ 2 with newly designated § 112(b) for applications filed on or after September 16, 2012. *See Alcon Res. Ltd. v. Barr Labs.*, 745 F.3d 1180, 1183, n.1 (Fed. Cir. 2014) (explaining that Paragraph 1 of 35 U.S.C. § 112 was replaced with newly designated § 112(a) by § 4(c) of the AIA, Pub. L. No. 112–29, and AIA § 4(e) makes those changes applicable "to any patent application that is filed on or after" September 16, 2012). Because the '845 Patent was filed in 2002, the Court evaluates these claims under the pre-AIA version of §112. *See*

its language, when read in light of the specification and the prosecution history, "fail[s] to

inform, with reasonable certainty, those skilled in the art about the scope of the invention."

*Nautilus, Inc., v. Biosig Instr., Inc.*, ___ U.S. ___, ___, 134 S.Ct. 2120, 2124, 189 L.Ed.2d 37

(2014). In evaluating the definiteness requirements, courts must (1) evaluate from the

perspective of someone skilled in the relevant art, (2) read the claims in light of the patent's

specification and prosecution history, and (3) measure the viewpoint of a person skilled in the art

as of the effective filing date. *Id.* at 2128. The "delicate balance" of the definiteness

requirement "'must allow for a modicum of uncertainty' to provide incentives for innovation, but

must also require 'clear notice of what is claimed, thereby appris[ing] the public of what is still

open to them.'" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1369 (Fed. Cir. 2014)

(citing *Nautilus*, 134 S.Ct. at 2128, 2129); *see Interval Licensing*, 766 F.3d at 1369 (explaining

how *Nautilus* found the Federal Circuit's characterization of indefiniteness by "insolubly

ambiguous" and "amendment to construction" expressions "more amorphous than the statutory

definiteness requirement allows"). "[T]he certainty which the law requires in patents is not

greater than is reasonable, having regard to their subject matter." *Nautilus*, 134 S.Ct. at 2130

(citing *Minerals Separation, Ltd. v. Hyde,* 242 U.S. 261, 270, 37 S.Ct. 82, 61 L.Ed.286 (1916));

*see also Markman v. Westview Instr., Inc.*, 517 U.S. 370, 389, 116 S.Ct. 1384, 134 L.Ed.3d 577

(claim construction calls for "the necessarily sophisticated analysis of the whole document," and

may turn on evaluations of expert testimony"). "The claims, when read in light of the

specification and prosecution history, must provide objective boundaries for those of skill in the

art." *Interval Licensing*, 766 F.3d at 1371 (citing *Nautilus*, 134 S.Ct. at 2130 & n. 8 (indicating

that there is an indefiniteness problem if the claim language "might mean several different things

---

*Media Rights Techs, Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1370, n.1 (Fed. Cir. 2015) (applying
the pre-AIA version of § 112 to a patent filed before the September 16, 2012 effective date).

and 'no informed and confident choice is available among the contending definitions'")); *see also id.*, 766 F.3d at 1371 (citing *Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008) (explaining that a claim term's definition that can be reduced to words can still render the claim indefinite "if the person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope.")).  The party alleging indefiniteness under Section 112 must prove by clear and convincing evidence that the challenged claims of the patent are indefinite.  *See Nautilus*, 134 S.Ct. at 2130, n.10; 35 U.S.C. § 282(a) ("A patent shall be presumed valid").

In conducting this inquiry, a court may make findings of fact regarding indefiniteness, but indefiniteness remains a matter of law.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, ___U.S.___, 135 S.Ct. 831, 841, ___L.Ed.2d ___ (2014); *Brown v. Baylor Healthcare Sys.*, 381 Fed. Appx. 981, 982 (Fed. Cir. 2010) ("Indefiniteness under 35 U.S.C. § 112, ¶ 2 is [] a matter of law …"); *see also Fujitsu Ltd. v. Tellabs Ops., Inc.*, 782 F.Supp.2d 635, 644-45 (N.D. Ill. 2011) (explaining indefiniteness is determined by the court as a matter of law).

### B.      The '845 Patent

The '845 Patent is directed to the use of graphical indicators affixed to the surface of an object and negligible to the human eye that provide information, beyond the visual text and images on the object's surface, that is retrievable through an electronic system.  (R.91-1, at JA1, abstract.)  The specification describes a method for producing visually negligible dot patterns – referred to as "graphical indicators" – affixed to a surface (e.g., the page of a book), that overlap and co-exist, but do not interfere, with the main information on the surface of the object (e.g., visual text and images).  (*See id.*, at JA19, col.2:55 – JA20, col.3:3.)

### 1. The Intrinsic Evidence

All of the claims currently at issue—Claims 9, 25, 35-36, 52-55, 57-60, 62-64, 66, 68, 71-77, 79-82, 85-90—require a "graphical indicator" to be "visually negligible".  (Stmt. of Undisputed Facts, ¶¶ 9, 18.)  The term "visually negligible" modifies the graphical indicator found in the image viewed by the user.  (*See* R.91-1, at JA23-25 (Claims 1, 18, 33, and 43).)

The "Summary of the Invention" and the "Detailed Description of the Preferred Embodiment" provide an explanation of "visually negligible", stating:

> Some visually negligible graphical indicators are affixed on the surface of an object.  The graphical indicators co-exist with main information, such as a text or picture, on the surface of object, and do not interfere with the perception of human eyes to the main information.

(R.91-1, JA19, col.1:49-54; *id.*, col.2:59-64.)  The specification goes on to provide example designs for the graphical indicators, which "are so visually negligible that [they] do not interfere with the main information on the surface of the object."  (R.91-1, at JA20, col.3:6-9; Stmt. of Addt'l Undisputed Facts, ¶ 1c; R.91-1.)  An example of a visually negligible graphical indicator layout is provided by Fig. 1(A), "a schematic diagram illustrating the graphical indicators on the surface of object in accordance with the present invention."  (R.91-1, at JA19, col.2:3-5.)  Figure 1(a) is shown below:



## Fig.1(A)

As described in the specification:

> Shown in FIG 1(A), which has scale of 2.5:1, the combination **100** of the graphical micro-units in a background to "APPLE" is the matrix consisting of

graphical micro-units. The micro-units can be reduced further such that the combination **100** of the graphical micro-units is visually negligible or is viewed as a background material by human eyes.

In practical application, the shape of the graphical micro-units may be regular or irregular shape, such as a round spot. For best result[s], the graphical micro-unit must be so tiny that only a microscope apparatus can detect it.

When the graphical micro-units are tiny and arranged loosely in the layout, the user easily neglects the combination **100** of graphical micro-units and pays attention to main information, like the word "APPLE" depicted in FIG. 1(A).

(R.91-1, at JA20, col.3:12-29.)

There are requirements for the graphical indicators being negligible to human eyes. First, each graphical indicator must be tiny and human eyes can not [sic] differentiate one graphical indicator from others. Second, according to the size of the graphical micro-unit, the pitch between micro-unit, and the desired visual effect, one should reduce the number of the graphical micro-units used. In this way, the graphical indicators have little influence on the brightness of the surface of [the] object. Furthermore, [the] number of graphical micro-units of each graphical indicator is substantially equal to each other, and therefore the graphical indicators look more homogenous to human eyes and become invisible to human eyes.

(*Id.*, col.4:60 – JA21, col.5:5.) The specification also provides two embodiments providing for 3000 and 6000 state zones, respectively, in each square centimeter of the selected zone, and further specifying that for both embodiments the state zones have "less than [70%] in the first state, and [the] percentage of area occupied by the graphical micro-unit in the state zone is less than 80[%]." (*Id.*, at JA21, col.5:6-15.)

During prosecution of the '845 Patent, the PTO found that the allowable features of the claims during prosecution "were that none of the art had an optical device to capture an image from a zone of a surface of an object, where the image is visually negligible and includes a graphical indicator." (R.95-1, at JA1417.) During the first ex-parte reexamination, the PTO found that substantial new questions of patentability existed with respect to the '845 Patent claims based on the PTO's interpretation of prior art that disclosed, *inter alia*, graphical

24

indicators that were "visually negligible". Specifically, the PTO interpreted a prior art Canadian patent, CA 2 374 808 ("Fahraeus"), and U.S. Patent No. 5,416,312 ("Lamoure"), as disclosing graphical indicators that are, *inter alia*, "visually negligible". (R.95-1, at JA1436-37; *id.*, at JA1444.) Sonix did not distinguish these references on the basis of their visual negligibility. Instead, it argued that the graphical indicators of Fahraeus and Lamoure have position dependent codes that are "unable to account for orientation." (*Id.*, at JA1460-61.) Sonix further distinguished Lamoure based on its teaching of a single spacing solution to the problem of differentiating between closely spaced indexes on a sheet and further noted that Lamoure did not conceive of a "header … to differentiate among multiple indexes in the field of view of the optical reader. (R.95-2, at JA1553-54.) The first Ex Parte Reexamination Certificate for the '845 Patent issued on December 27, 2011 (R.95-3, at JA1670-71.)

During the second ex parte reexamination, the PTO rejected the '845 Patent claims based on U.S. Patent No. 5,329,107 ("Priddy"), U.S. Patent No. 4,604,065 ("Frazer") and Lamoure. (R.96-1, at JA1687.) In arguing against the rejection under 35 U.S.C. § 103 as unpatentable over the combination of Priddy with Lamoure, Sonix stated that the combination did not provide a "visually negligible" matrix:

> To be visually negligible, a dot pattern superimposed over text and/or graphics must co-exist with such text and graphics and must not interfere with the viewer's perception of the text and graphics. *See* '845 patent, Col. 1, ll. 49-54; Col. 2, 11. 59-64; Col. 3, ll. 5-8. A person of ordinary skill in the art (such as Lamoure) would recognize that Priddy teaches a matrix that is by definition highly anisotropic with areas of very high density, and potentially of very high density. The predictable result of combining Lamoure and Priddy is a pattern that is not visually negligible, but rather substantially interferes with the text and images on the surface.

(R.97-4, at JA2056.)  In support of this position, Sonix submitted the Sejersen Affidavit,

illustrating the effect of using a "Priddy Perimeter."  (*Id.*, at JA2064-71.)  Mr. Sejersen

concluded:

> [A] person of ordinary skill in the art would not use a Priddy matrix or any dot
> pattern containing the Priddy Perimeter to create a pattern that could be
> superimposed over text or graphics.  A pattern made using a Priddy matrix or a
> dot pattern containing a Priddy Perimeter would be unsuitable for such a purpose
> because it would interfere with the viewer's perception of the text and/or graphics
> and would not be visually negligible.

(*Id.*, at JA2071.)  Sonix further distinguished Priddy on the basis that it failed to teach "using the

perimeter of the matrix to distinguish one matrix from an adjacent matrix."  (*Id.*, at JA2059.)

The second Ex Parte Reexamination Certificate for the '845 patent issued on December 26,

2012.  (*Id.*, at JA2127-28.)

### 2.     The Extrinsic Evidence

Both Sonix's expert, Dr. Ashok, and Defendants' expert, Dr. Engels, applied the term

"visually negligible" in their expert reports.  (Stmt. of Addt'l Undisputed Facts, ¶ 2c.)

Dr. Ashok applied the term in distinguishing the '845 Patent's claims over the prior art.

Specifically, Dr. Ashok based his opinion regarding infringement of the "visually negligible"

element "on my inspection, visual inspection" and testified that "it crosses my threshold."  (Stmt.

of Undisputed Facts, ¶ 24.)  Dr. Ashok opined that dot matrix codes and bar codes—the '845

Patent specification referring to the "present invention" as a "substitute for bar codes"—are

intentionally "visually intrusive."  (*Id.*; R.91-1, at JA23, col.9:46-59.)  He also opined that the

Lamoure prior art reference's use of mandatory spacing appears to create a non-isotropic pattern

that may render the pattern "visually intrusive."  (Stmt. of Undisputed Facts, ¶ 20.)  Dr. Ashok

opined that Lamoure has changes in density that "will tend to make the pattern more noticeable

to the reader, resulting in patterns that are not visually negligible."  (*Id.*)

26

Dr. Ashok also relied on the "visually negligible" claim term in his infringement report and stated that "the term 'visually negligible' means that the dots (or micro-units) printed on the surface do not interfere with the visually significant text and images—referred to in the '845 Patent as 'main information'—on the surface." (R.184-3, Ex. D, Ashok Infringement Report, at 18.) In stating his opinion of infringement, Dr. Ashok stated:

> The dot patterns printed on the Accused Products are visually perceptible to a degree if one views the printed material very carefully at close distance in the proper lighting, but they do not interfere at all with the user's perception of the text and images on the surface. A typical user is unlikely to even notice and would not pay any attention to these background patterns on the pages of the various books and globes in question when they are viewing the text and images. Thus, it is my opinion that the dot patterns printed on all of the Accused Products satisfy the claim requirement that they be "visually negligible."

(*Id.*, at 19.) Dr. Ashok testified that the '845 Patent's example densities were not a "universal standard by any means because it depends on the visual acuity of the observer." (Stmt. of Undisputed Facts, ¶ 22.) He further stated, "I would imagine that would be representative of most people looking at it." (*Id.*) In response to whether it was "fair to say what might be visually negligible to one person might not be to another person", Dr. Ashok testified "I would say some people may be able to have a lower threshold, but the general population would be very close to a standard threshold. I don't know what that may be, but I would imagine there would be such a threshold." (*Id.*, ¶ 23; Stmt. of Addt'l Undisputed Facts, ¶ 2.) Dr. Ashok did not conduct any independent studies to determine what a typical user or the person of ordinary skill would consider to be visually negligible. (Stmt. of Undisputed Facts, ¶ 26.) When asked to provide examples of "visually negligible", Dr. Ashok shared his belief that the '845 Patent had some example densities of a dot pattern, and that he believed those densities to be "visually negligible". (*Id.*, ¶ 27.)

Dr. Engels, Defendants' liability expert, also applied the term "visually negligible" in his invalidity and non-infringement expert reports. In his opening invalidity expert report, for example, Dr. Engels discussed Lamoure, stating that "Lamoure discloses using the ink dots on the page to store a value that is used as an index to access a computer database … Each ink dot is between 50 µm and 100 µm in diameter. … At this size, each dot is on the size order of tens of micro-meters and is clearly a micro-unit that is a visually negligible feature." (*See* R.153-17, ¶ 85; *id.*, ¶ 48 (describing Lamoure as disclosing printing groups of dots that "can be printed in a density and size such that they would be visually negligible"); *see also id.*, ¶¶ 50, 102, 103, 151, 171, 177, 196.) Dr. Engels also opined in his Responsive Expert Report that "visually negligible" as defined by the '845 Patent means "co-existing with main information, such as text or picture, on the surface of an object and not interfering with the perception of human eyes to the main information." (R.164-3, ¶ 142.) Based on this definition, Dr. Engels agreed that "the dot patterns in the specific products reviewed by Dr. Ashok in his Report are visually negligible …." (*Id.*, ¶ 144.) Dr. Engels does not agree, however, that the same is true for all the Accused Products because "Dr. Ashok has not examined all of the Accused Products, and he has provided no factual evidence to support his opinion that all of the Accused Products meet these claim limitations." (*Id.*, ¶ 145.) At his deposition, Dr. Engels agreed with Dr. Ashok that the term "visually negligible" is subjective, and that no objective test exists to define the boundary between visually negligible and visually non-negligible. (Stmt. of Undisputed Facts, ¶ 33; R.158-11, Engels Deposition Rough Tr., at 15-16.)

28

**C. "Visually Negligible" is Indefinite**

**1. The Intrinsic Evidence Lacks the Necessary Guidance for the Person of Ordinary Skill**

The claim language simply refers to "visually negligible" and provides no further guidance on the meaning of that term.[12]  The Court must, therefore, look to the written description for guidance of this, otherwise, purely subjective claim term.  The specification, however, also fails to provide the person of ordinary skill in the art with a meaning that is reasonably certain and defines the objective boundaries as to the scope of "visually negligible" as used in the '845 Patent.  *See Interval Licensing*, 766 F.3d at 1371.  Sonix contends that the term on its face refers to something that may be visible, but does not interfere with the user's perception of other visual information on a surface.  (R.188, at 3.)  Sonix further asserts that this concept of "non-interference" with main information is maintained consistently throughout the specification.  (*Id.*)  The problem with Sonix's definition, however, is that even if a claim term can be defined, it can still be found indefinite "if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."  *See Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1251 (Fed. Cir. 2008); *see also Nautilus*, 134 S.Ct. at 2130 ("It

---

[12] At oral argument, Sonix raised new arguments related to the relationship between the independent claims reciting "visually negligible" and some of the dependent claims.  The Court does not consider these arguments here.  *See Hernandez v. Cook Cnty. Sherriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (citations omitted) (explaining that arguments made for the first time in reply are treated as waived based on the underlying concern of ensuring the opposing party is not prejudiced by being denied sufficient notice to respond); *see also Darif v. Holder*, 739 F.3d 329, 336 -337 (7th Cir. 2014).  Even if the Court did consider Sonix's arguments, however, it finds the dependent claims to which Sonix referred (Claims 60 and 77) do not provide guidance for the limitations of the scope of "visually negligible" because while they may provide limitations for the number of state zones or percentage of area occupied by the graphical micro-unit in the examples covered by those claims, they do not provide the person of ordinary skill with reasonable certainty as to the edges of the broader scope for those parameters in the independent claims which embody scope outside of the specified limitations of the dependent claims.  *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("Since independent claims are presumed to have broader scope than their dependents …").

cannot be sufficient that a court can ascribe *some* meaning to a patent's claims …") (emphasis in original).   Even if consistently used in the patent specification, defining "visually negligible" as reliant on the user's perception provides no objective standard by which to measure the scope of the term—the user's perception becomes the measure and this is insufficient.  *See Datamize*, 417 F.3d at 1350 (explaining that a term of degree fails to provide sufficient notice of scope if it depends "on the unpredictable vagaries of any one person's opinion").  Whether something "interferes" with a user's perception of an image depends on the visual acuity and desired visual preferences of any single user interacting with the image.

The specification lacks guidance that would otherwise provide one of skill with reasonable certainty of the claim scope.  The specification suggests that "for best result[s]", the graphical micro-units "must be so tiny that only a microscope apparatus can detect it."  (*See* R.91-1, at JA20, col.3:24-25.)  It contains no information, however, regarding what type of microscope apparatus or what level of magnification the user would need to use in order to qualify as detection.  The specification also suggests that in order for the user to pay attention to the main information and "easily neglect[] the combination of graphical micro-units", the micro-units should be "tiny and arranged loosely in the layout."  (*See id.*, col. 3:26-31.)  The specification refers to Figure 1(A) as an example.  (*Id.*)  Figure 1(A) is a schematic drawing that shows the word "APPLE" printed on top of graphical indicators with a magnification of 2.5 times the reader's perspective.  (R.91-1, at JA3; *id.*, at JA20, col.3:15-18; *see* Nov. 10, 2015 Summary Judgment Hrg. ("Nov. 10, 2015 Hrg."), at 33-34.)  The example provided in Figure 1(A) is simply that—an illustration of a graphical indicator that the '845 Patent describes as "visually negligible".  (R.91-1, at JA20, col.3:4-21.)  The example does not, however, provide guidance beyond this single illustration as to the scope of the "visually negligible" term.

The '845 Patent specification lists "requirements" for graphical indicators to be negligible, yet these requirements also fail to provide the necessary guidance. It discloses three requirements dealing with size, number, and proportion,[13] but the disclosure lacks the necessary detail to make the requirements meaningful or to provide the person of ordinary skill with reasonable certainty of the scope of the claim's term beyond the requirements. The first requirement of size merely commands that the graphical indicators "must be tiny and human eyes cannot differentiate" between them. (*See* R.91-1, at JA20, col. 4:61-63.) The second requirement of number provides nothing more than the general statement that based on "the size of the graphical micro-unit, the pitch between micro-unit[s], and the desired visual effect, one should reduce the number of [] graphical micro-units used." (*Id.*, col. 4:63-66.) The specification further states that the number of graphical micro-units of each graphical indicator are "substantially equal to each other, and therefore the graphical indicators look more homogenous to human eyes and become invisible to human eyes." (*Id.*, at JA21, col.5:1-5.) The '845 Patent specification then provides two "visually negligible" embodiments that have (1) a minimum of 3000 or 6000 state zones per square centimeter, (2) less than 70% of the state zones in the first state (i.e., filled with a graphical micro-unit) and (3) graphical micro-units that occupy less than 80% of the state zone. (*Id.*, at JA21, col.5:6-15.)

Sonix does not advocate for a claim construction that is limited to these embodiments. Indeed, Sonix adamantly stated that the claims are not limited to the factors listed in the two

---

[13] While Sonix originally relied on the specification's disclosure of ink choice as a parameter related to the "visually negligible" claim term, Sonix admitted at oral argument that this discussion in the specification was inapplicable as it is "directed more to a separate issue than to visual negligibility. The issue of ink selection is relevant to visual negligibility in the sense that you can choose inks that may or may not be more or less visually prominent." (Nov. 10, 2015 Hrg., at 46-47.) Because the specification does not provide meaningful guidance on the ink choice to the person of ordinary skill looking to design a "visually negligible" graphical indicator, the Court does not consider it here.

embodiments. (Nov. 10, 2015 Hrg., at 39-40.)  While illustrative of "visually negligible" graphical indicators, the embodiments are not limitations of the claim and therefore, do not help to define the claim's objective boundaries because they leave open the question of what else would suffice as "visually negligible".  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (citations omitted) ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); *see also Akamai Techs., Inc. v. Limelight Networks, Inc.*, ___ F.3d ___, 2015 WL 7148812, at *5 (Fed. Cir. Nov. 16, 2015) (*citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction").  Indeed, the specification later states "[t]hose skilled in the art will readily observe that numerous modifications and alterations of the device may be made while retaining the teaching of the invention.  Accordingly, the above disclosure should be construed as limited only by the metes and bounds of the appended claims."  (R.91-1, at JA23, col.10:14-18.)  The specification leaves open the question of claim scope for the person of ordinary skill designing a "visually negligible" graphical indicator that does not follow the recipes provided by the two embodiments.  In other words, if operating outside of the embodiments' parameters, there is no measure by which one of skill in the art can determine whether the graphical indicators are indeed "visually negligible."   As argued by Sonix, whether a particular pattern is "visually negligible depends on a variety of factors.  It may be impacted by the type of paper.  It may be impacted by other things.  It can be affected by the sheen of the paper. It can be affected by the size of the dots, the arrangement of the dots."  (Nov. 10, 2015 Hrg., at 39.)

32

While the '845 Patent specification discloses a few particular examples that include some, but not all, of these factors, the specification does not provide guidance to the person of ordinary skill as to which factors affect visual negligibility and how to assess whether a potentially infringing product may meet the limitations of the claim—at least, nothing that provides guidance to avoid the ultimate question that the answer is left to the subjective perception of each user. The prosecution and reexamination of the '845 Patent do not provide any additional guidance other than to observe that combinations of prior art patterns upon which the examiner relied in rejecting the claims produce "a pattern that is not visually negligible, but rather substantially interferes with the text and images on the surface." (R.97-4, at JA2056.) The Sejersen declaration provides no additional guidance as it simply concludes that "[a] pattern made using a Priddy matrix or a dot pattern containing a Priddy Perimeter would be unsuitable for such a purpose because it would interfere with the viewer's perception of the text and/or graphics and would not be visually negligible." (*Id.*, at JA2071.)

### 2. The Extrinsic Evidence Demonstrates the Difficulty in Application of "Visually Negligible"

The intrinsic evidence is clear that the term "visually negligible" is dependent on the subjective choice of the user and while specific examples are provided, these examples are not limitations of the claim and do not provide boundaries for the broader claim scope. The extrinsic evidence, while not necessary for the Court's consideration here, highlights the problem with the subjective nature of the "visually negligible" claim term.

Even though the parties' experts apply the term "visually negligible" to the prior art, for example, they have no standard by which to measure beyond their subjective belief and they, unsurprisingly, disagree in their ultimate opinions. Defendants' expert, Dr. Engels, opines that Lamoure discloses a "visually negligible" dot pattern, whereas Dr. Ashok opines that Lamoure's

dot patterns are not visually negligible and are instead "visually intrusive." (*See e.g.,* R.153-17, ¶ 85; Stmt. of Undisputed Facts, ¶ 20.) While it is not uncommon for experts to disagree, the experts provide no guidance to assess which testimony to credit or disregard. The experts seem to agree on one point, however, that the measure of "visually negligible" is subjective and that no objective test exists to define the boundaries between visually negligible and visually non-negligible. (Stmt. of Undisputed Facts, ¶ 33.)

As Sonix's infringement expert admits, an objective standard is missing and ultimately the determination of whether a dot pattern is "visually negligible" falls to the perception of the user. Indeed, Dr. Ashok's infringement opinion relies on a hypothetical situation where "one views the printed material *very carefully* at *close distance* in the *proper lighting*." (R.184-3, at 19.) Dr. Ashok does not, however, provide any parameters as to what it means to look very carefully at the image or what the lighting conditions and viewing distance should be. (*See id.*, at 19.) Dr. Ashok further relies on the perspective of "a typical user" but admits that he did not conduct any independent studies to confirm what is visually negligible to the typical user. (Stmt. of Undisputed Facts, ¶ 26.) Furthermore, later in Dr. Ashok's infringement report he refers to the graphical micro-units that are "so small that they are barely perceptible to the naked eye, but when magnified they are clearly small dots printed on the surface of the page". (R.184-3, at 22.) Again, Dr. Ashok provides no guidance as to the visual acuity of the "naked eye" to which he refers or to the level of magnification that makes the dots become "clearly small dots".

### 3. Guidance from the Federal Circuit on the *Nautilus* Indefiniteness Test

The Federal Circuit's precedent since the Supreme Court redefined the test for indefiniteness in *Nautilus* provides helpful guidance. In *Interval Licensing*, for example, the patents at issue described a system that acquires data, schedules display of the data, generates

images from the data, and then displays the images on a device.  766 F.3d at 1366.  Certain

patent claims required the system to selectively display the images "in an unobtrusive manner

that does not distract a user of the display device …"  *Id.*, at 1368.  The district court found that

"the terms 'in an unobtrusive manner' and 'does not distract' a user, whether used together or

separately," were indefinite.  *Id.*, at 1368-69.  The patents included two embodiments that the

patentee argued informed those of skill in the art of the spatial meaning of "unobtrusive" in the

context of the patents.  *Id.*, at 1371.  The patentee argued that the district court failed to

appreciate the language describing "display" and improperly divorced its analysis from the

context of the written description and incorrectly focused on irrelevant hypotheticals.  *Id.*  The

Federal Circuit disagreed and found the claim term "unobtrusive manner" indefinite based on its

highly subjective nature and, its failure to, on its face, provide guidance to one of skill in the art.

*Id*.  The Federal Circuit reasoned that the claim language offered no objective indication of the

manner in which content images are to be displayed to the user.  *Id*.  The specification's

ambiguity, according to the Federal Circuit, did not tie its use of "unobtrusive manner" to a

specific display.  *Id.*, at 1371-74.  The Federal Circuit also found that the prosecution history

further illustrated the difficulty of the term because during prosecution and reexamination the

applicants' limited the term to one display (wallpaper embodiment), but in a decision from the

Patent Trial and Appeal Board, they found the term not so limited.  *Id.*, at 1373.  Although the

specification contained an exemplary provision of a display, the Federal Circuit refused to limit

the term's meaning as even "with this lone example, a skilled artisan is still left to wonder what

other forms of display are unobtrusive and non-distracting.  What if a displayed image takes up

20% of the screen space occupied by the primary application with which the user is interacting?

Is the image obtrusive?  The specification offers no indication, thus leaving the skilled artisan to

consult the 'unpredictable vagaries of any one person's opinion.'" *Id.*, at 1374 (*citing Datamize*, 417 F.3d at 1350).

Similarly, in *Datamize*, the patent at issue disclosed a software program that allowed a person to author user interfaces for electronic kiosks. 417 F.3d at 1344.[14] The "authoring system gives the system author a limited range of pre-defined design choices for stylistic and functional elements appearing on the screens." *Id.* The claims included a limitation for interface screen element types that required the element type to have limited variation of its on-screen characteristics "in conformity with a desired uniform and aesthetically pleasing look and feel for said interface screens …". *Id.*, at 1345. The district court found the term indefinite and the Federal Circuit agreed. *Id.*, at 1347, 1356. The Federal Circuit found the claim language and the specification "fail[ed] to provide one of ordinary skill in the art with any way to determine whether an interface screen is 'aesthetically pleasing'." *Id.* at 1349. While the Federal Circuit found the specification's context helpful to identifying the components of the claimed invention that are required to be "aesthetically pleasing", the specification lacked guidance and meaningful definitions for what the phrase meant. *Id.* In particular, the specification provided the various aspects of the screen that may affect the "aesthetically pleasing" nature: button styles, sizes, placements, window borders, color combinations, and type fonts. *Id.* at 1352. One of the patent's embodiments also provided examples of aesthetic features in screen displays that can be controlled by the authoring system, but this same embodiment fails to explain what selection of these features would be "aesthetically pleasing." *Id.* In addition, in response to an indefiniteness rejection during prosecution, applicants stated the term "is not intended to imply judgment on the

---

[14] Although the Supreme Court's decision in *Nautilus* changed the indefiniteness test utilized in *Datamize*, the Federal Circuit has favorably cited *Datamize* and its resultant finding that the claim term "aesthetically pleasing" was indefinite in post-*Nautilus* decisions. *See e.g., Interval*, 766 F.3d at 1370, 1372, 1374; *DDR Holding, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014)

relative artistic merits of the 'look and feel'" since "one practicing the invention can create an 'aesthetically pleasing look and feel' that is 'desired' by that person and that is maintained as desired on screens of the system." *Id.*, at 1353. The expert testimony only served to further highlight the term's difficulty as the patentee's expert testified regarding various parameters of design that contribute to an "aesthetically pleasing" display, but failed to explain how the parameters should be evaluated or weighed to reach the conclusion that an interface is indeed "aesthetically pleasing". *Id.*, at 1354. The Federal Circuit stated "[t]he inability of the expert to use the parameters he himself identified to determine whether an interface screen is "aesthetically pleasing" militates against the reasonableness of those parameters as delineating the metes and bounds of the invention." *Id.*

On the other hand, in *Enzo Biochem*, the Federal Circuit found the claim term "not interfering substantially", definite based on the guidance from the claims and specification. 599 F.3d at 1333-34. The *Enzo* patent claims were directed to various techniques for labeling and detecting nucleic acids—DNA and RNA. *Id.*, at 1328. The Federal Circuit found the claims provided guidance by way of a specific chemical linkage group claimed in a dependent claim that would allow the person of ordinary skill to presume the independent claims allow "for at least as much interference as that exhibited when the linkage group has the structure specified in the dependent claim." *Id.*, at 1333-34. The *Enzo* patent specification provided additional guidance in a description of the possible chemical structures of the linkage groups, and provided a test for the person or ordinary skill to use in assessing the boundaries of the claim— experimental conditions that the linkage group should be able to withstand. *Id.*, at 1334. The specification disclosed a test that the Federal Circuit found "a person of ordinary skill would likely look to the thermal denaturation profiles and hybridization properties … of the modified

nucleotide, to see whether they fall within the range of exemplary values disclosed in the intrinsic evidence." *Id.*, at 1335.

The '845 Patent's use of "visually negligible" is more similar to the scenarios presented in *Interval Licensing* and *Datamize*. The claims provide guidance only as to the subjective component that is required to be "visually negligible"—the graphical indicator. The specification provides very general descriptions for parameters of the graphical indicator—size, number and layout, describing them as "tiny" graphical micro-units and "loosely arranged" dot patterns with "regular or irregular" shaped graphical micro-units. The embodiments in the specification, while providing examples of "visually negligible" graphical indicators, do not provide a measure for the objective boundaries of the claim term outside of those examples and Sonix does not advocate for the Court to read these limitations into the claims.[15] Furthermore, the expert testimony from Dr. Engels and Dr. Ashok confirms the subjective application of the "visually negligible" claim term in practice when looking at the prior art and other dot patterns disclosed—no uniform result is produced and no objective test is provided.

Unlike *Enzo*, the '845 Patent claims do not provide any additional guidance to the scope of "visually negligible" and the specification, although it provides examples of "visually negligible", does not provide parameters outside of those examples for the person of ordinary skill to have reasonable certainty regarding whether the graphical indicator they are using is

_____

[15] Indeed, it is not clear that limiting the claims reciting "visually negligible" to the embodiments would be proper here where the dependent claims are modeled after the embodiments and neither party points to language that would constitute a clear disavowal on Sonix's part to warrant importation of the limitations. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("The standards for lexicography and disavowal are exacting"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (explaining that the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment" absent "a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'").

"visually negligible". There is no disclosure identifying a method of measurement or assessment, like the experimental conditions test of *Enzo*, to determine "visually negligible" graphical indicators and ultimately, the determination is still left to the perception of the user. *See Datamize*, 417 F.3d at 1350 (finding the claim term indefinite because the scope of the claim term will "depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention).

The general lack of guidance in the intrinsic and extrinsic evidence related to the '845 Patent, therefore, renders the metes and bounds of the "visually negligible" claim term unknown to the person of ordinary skill. Unlike the functional aspects of the graphical indicator which provide an ultimate test for whether they meet the claim terms—i.e., whether they can perform the claimed function—the aesthetic aspects of the design as "visually negligible" rely on a term that provides no test or measure for the person of ordinary skill in the art to use in answering the question of whether their graphical indicator is "visually negligible." In addition, the intrinsic evidence beyond the claims—the specification and prosecution history—does not rescue the inherently subjective measure for the "visually negligible" claim term. As the Supreme Court teaches, "a patent must be precise enough to afford clear notice of what is claimed … [o]therwise there would be 'a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'" *See Nautilus*, 134 S.Ct. at 2129. "[A]bsent a meaningful definiteness check … patent applicants face powerful incentives to inject ambiguity into their claims." *Id.*[16] The ambiguity injected into the '845 Patent claims leaves the person of ordinary

---

[16] Admittedly, in Sonix's response to Defendants' invalidity contentions, it provides broad general recitations that the "visually negligible" claim limitation is met by examples disclosed in the prior art that it simply characterizes as "negligible", "visually negligible", "highly visible" or that "disclose[] that the density and size of its graphical indicators would make the indicator visually negligible". (*See e.g.,* R.213-1, Sonix's Resp. to Defs' Final Invalidity Contentions, Attachment A, at 2, 15, 16, 26, 30, 35, 39, 40, 43.)

skill wandering around the claims' edges without knowledge of the metes and bounds of "visually negligible" graphical indicators beyond the ultimate subjective perception of the user. *See Datamize*, 417 F.3d at 1353 (finding the claim term indefinite because it "fails to delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude"). This is inadequate under 35 U.S.C. § 112. As such, the Court finds the term "visually negligible" indefinite and grants summary judgment for Defendants on this basis.

## II.     Defendants Motion for Summary Judgment of Non-Infringement & Pre-Suit Damages

The Court's determination that the '845 Patent is invalid due to indefiniteness precludes any finding of infringement, and related damages. As such, Defendants' motion for summary judgment based on non-infringement and pre-suit damages is denied as moot.

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendants' summary judgment motion. Specifically, the Court grants Defendants' motion for summary judgment that the '845 Patent is invalid for indefiniteness and denies as moot Defendants' motion for summary judgment regarding non-infringement and pre-suit damages.

**DATED:  December 8, 2015**

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge

A0042

(12) **United States Patent**          (10) **Patent No.:**     **US 7,328,845 B2**

Tsai                                    (45) **Date of Patent:**     **Feb. 12, 2008**

(54) **METHOD FOR PRODUCING INDICATORS AND PROCESSING APPARATUS AND SYSTEM UTILIZING THE INDICATORS**

(75) Inventor: **Yao-Hung Tsai**, Taipei (TW)

(73) Assignee: **Sonix Technology Co., Ltd.**, Chupei, Hsinchu (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1115 days.

(21) Appl. No.: **10/189,244**

(22) Filed: **Jul. 2, 2002**

(65) **Prior Publication Data**

US 2003/0133164 A1     Jul. 17, 2003

(30) **Foreign Application Priority Data**

Jan. 11, 2002     (TW) ............................... 91100350 A

(51) **Int. Cl.**
　**G06K 7/10**     (2006.01)
　**G06K 7/14**     (2006.01)
(52) **U.S. Cl.** ..................................... **235/454**; 235/435
(58) **Field of Classification Search** ............... 235/454, 235/435
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,627,819 A | 12/1986 | Burrows | 434/337 |
| 4,869,532 A | 9/1989 | Abe et al. | 283/58 |
| 5,329,108 A | 7/1994 | Lamoure | 235/494 |
| 5,416,312 A | 5/1995 | Lamoure | 235/494 |
| 5,473,536 A * | 12/1995 | Wimmer | 700/90 |
| 5,852,434 A | 12/1998 | Sekendur | 345/179 |
| 5,866,895 A | 2/1999 | Fukuda et al. | 235/494 |

| | | | |
|---|---|---|---|
| 5,945,656 A | 8/1999 | Lemelson et al. | 235/462.01 |
| 5,959,285 A | 9/1999 | Schuessler | 235/462.04 |
| 6,229,964 B1 | 5/2001 | Bell | 396/310 |
| 6,412,695 B1 | 7/2002 | Reber et al. | 235/462.07 |
| 6,441,921 B1 | 8/2002 | Soscia | 358/1.9 |
| 6,460,766 B1 | 10/2002 | Olschafskie et al. | 235/454 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP          0 626 660 A2     11/1994

(Continued)

OTHER PUBLICATIONS

Elektronik, Weka Fachzeitschriftenverlag, Poing, DE, VIL 49, No. 16, pp. 74-76, XP 001107913, "*Handschrift Per Funk in Die Ganze Welt.*", 2000.

(Continued)

*Primary Examiner*—Lisa Caputo
(74) *Attorney, Agent, or Firm*—Reed Smith LLP; Stanley P. Fisher, Esq.; Juan Carlos A. Marquez, Esq.

(57)          **ABSTRACT**

The present invention discloses a method for producing graphical indicators and interactive systems for utilizing the graphical indicators. On the surface of an object, visually negligible graphical indicators are provided. The graphical indicators and main information, i.e. text or pictures, co-exist on the surface of object. The graphical indicators do not interfere with the main information when the perception of human eyes are concerned. With the graphical indicators, further information other than the main information on the surface of object are carried. In addition to the main information on the surface of object, one is able to obtain additional information through an auxiliary electronic device or trigger an interactive operation.

**51 Claims, 16 Drawing Sheets**



**US 7,328,845 B2**

Page 2

U.S. PATENT DOCUMENTS

6,473,762 B1 * 10/2002 Knoblock et al. .......... 707/100

FOREIGN PATENT DOCUMENTS

| EP | 0 660 261 A2 | 6/1995 |
|----|----|----|
| EP | 0 764 944 A2 | 3/1997 |
| JP | 9031382 | 2/1997 |
| JP | 10251570 | 9/1998 |
| JP | 11112787 | 4/1999 |
| JP | 2000022930 | 1/2000 |
| JP | 2001096889 | 4/2001 |
| JP | 2001346032 | 12/2001 |

| JP | 2001353955 | 12/2001 |
|----|----|----|
| WO | WO 00/73981 A1 | 7/2000 |

OTHER PUBLICATIONS

CT Magazin Fuer Computer Technik, Heise Zeitschiften Verlag, Hannover, DE, p. 22, XP 00963015, "*E-Commerce mit Stift Auf Papier.*", 2000.

Computer, IEEE Service Center, Los Alamitos, CA, USA, vol. 34, No. 3, pp. 47-51 and 54, XP 001053842, "*Printed Embedded Data Graphical User Interfaces.*", 2001.

* cited by examiner



~100

## Fig.1(A)



## Fig.1(B)

| | | | | |
|---|---|---|---|---|
| 0 | 0 | 1 | 0 | 0 |
| 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 1 | 0 | 0 |
| 1 | 0 | 0 | 0 | 0 |
| 0 | 0 | 1 | 0 | 0 |

~114

## Fig.1(C)



**Fig.1(D)**



**Fig.1(E)**



# Fig.1(F)



**Fig.2(A)**

| 1 | 0 | 1 |
|---|---|---|
| 1 | 1 | 0 |
| 1 | 0 | 1 |

**Fig.2(B)**



**Fig.2(C)**



# Fig.2(D)

ABCDABCDABCDABCDABCDABCDABCDABCD
ABCDABCDABCDABCDABCDABCDABCDABCD
ABCDABCDABCDABCDABCDABCDABCDABCD
ABCDABCDABCDABCDABCDABCDABCDABCD

# Fig.2(E)



**Fig.3**



Fig.4



**Fig.5**

Case: 16-1449    Document: 39    Page: 111    Filed: 04/06/2016



**Fig.6**

A0054



Acting light source irradiating
active light beam onto the
surface of object ——— 71

Sensor unit capturing the
scattered light from the
surface of object ——— 72

Sensor unit converting optical
image into electronic
information ——— 73

Image-processing circuit
retrieving the combination of
the graphical micro-units ——— 74

transform combination into
numerical code ——— 75

Calculate or retrieve indicator
information based on
numerical code ——— 76

Image-processing circuit
acquiring the additional
information ——— 77

Output circuit outputting the
additional information ——— 78

**Fig.7**



**Fig.8**



**Fig.9**



**Fig.10**



**Fig.11**



**Fig.12(A)**
**(Prior Art)**

**Fig.12 (B)**

US 7,328,845 B2

**1**

# METHOD FOR PRODUCING INDICATORS AND PROCESSING APPARATUS AND SYSTEM UTILIZING THE INDICATORS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a method for producing indicators and processing apparatus and system utilizing the indicators, and more particularly, to a method, an apparatus and a system for providing additional information from the indicators affixed onto the surface of an object.

### 2. Description of the Prior Art

Dating back to ancient time, people start delivering information by recording information on surfaces of various objects. For example, since the birth of paper, people acquire the information through characters and drawings affixed on papers. Furthermore, in recent years, with distinctive colors, characters, or pictures attached to different locations on surface of an object, people try to disclose the information with regard to each different position of the object.

When people observe the surface of object, they generally capture the information visually. However, the amount or types of the information carried by the surface of object are generally limited under the restrictions of the area size, beautification of the surface.

Nowadays, due to the advance of electronic technology, the visual information has been retrieved from its original carrier and stored as the digital information in an electronic apparatus. And people read them directly from the electronic apparatus. However, it is difficult for the digital information to totally replace the information printed in books or information attached to the surface of object.

On the other hand, through hyper link approach of computer technology, the digital information can be displayed in multiple dimensions, while the information printed in book or attached to the object still are displayed in two dimensions. Thus, if multiple dimensions information can be recorded on the book or the object, people can acquire additional information through the electronic apparatus.

## SUMMARY OF THE INVENTION

One aspect of the present invention is to provide a method for producing graphical indicators. Some visually negligible graphical indicators are affixed on the surface of an object. The graphical indicators co-exist with main information, such as a text or picture, on the surface of object, and do not interfere with the perception of human eyes to the main information. A user retrieves the graphical indicators through an electronic system that does not couple with the object and acquires additional information from the graphical indicators.

Another aspect of the present invention provides an apparatus and a system utilizing the graphical indicators. The apparatus or the system includes an optical-reading device, a processing device, and an output device. The optical-reading device captures an image including the graphical indicators from the surface of object, the processing device, responsive to the graphical indicators, acquires the corresponding additional information by processing and/or transforming the graphical indicators, and the output device outputs the additional information.

**2**

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**(A) is a schematic diagram illustrating the graphical indicators on the surface of object in accordance with the present invention;

FIG. **1**(B) is an enlarged diagram illustrating one of the graphical indicators in FIG. **1**(A);

FIG. **1**(C) is a schematic diagram illustrating the combination of the graphical micro-units in FIG. **1**(B) converting into the bit array;

FIG. **1**(D) is a schematic diagram illustrating the two-dimensional matrix form in accordance with the present invention;

FIG. **1**(E) is an enlarged diagram illustrating the index zones and the graphical indicators in accordance with the present invention;

FIG. **1**(F) illustrates the image corresponding to the matrix form of the graphical indicators converted into a bit matrix form in accordance with the present invention;

FIGS. **2**(A)-**2**(C) are the diagrams illustrating various embodiments in accordance with the present invention;

FIG. **2**(D) is the diagram illustrating other embodiment for the arrangement of the graphical indicators in accordance with the present invention;

FIG. **2**(E) is the diagram illustrating the different graphical indicators arranged in a index zone in accordance with the present invention;

FIG. **3** is a schematic diagram illustrating an electronic system in accordance with the present invention;

FIG. **4** is a schematic flowchart illustrating the operation of the electronic system in accordance with the present invention;

FIG. **5** is an embodiment of the processing system in accordance with the present invention;

FIG. **6** is a schematic diagram illustrating the electronic apparatus in accordance with the present invention;

FIG. **7** is a schematic flow chart illustrating the operation of the electronic apparatus in accordance with the present invention;

FIG. **8** is a schematic diagram illustrating one practical application in accordance with the present invention;

FIG. **9** is a schematic diagram illustrating the additional information used for controlling a response device in accordance with the present invention;

FIG. **10** is a schematic diagram illustrating the application of the present invention to information appliances;

FIG. **11** is a schematic diagram illustrating the additional information used to control other devices;

FIG. **12**(A) is a graph illustrating the conventional bar code in the prior art; and

FIG. **12**(B) is a graph illustrating use of indicators of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention provides a method for producing graphical indicators and interactive systems for utilizing the graphical indicators. Some visually negligible graphical indicators are affixed on the surface of an object. The graphical indicators co-exist with a main information, such as a text or picture, on the surface of object, and do not interfere with the perception of human eyes to the main information. A user retrieves the graphical indicators through an electronic system and acquires additional information from the graphical indicators. The user can utilize the graphical indicators without a complicated platform provid-

US 7,328,845 B2

3

ing coordinate system. Furthermore, the typical book or the surface of object can carry more information through the graphical indicators.

Exemplary Design for the Graphical Indicators

In the present invention, one aspect of the graphical indicators is that the graphical indicators are so visually negligible that do not interfere with the main information on the surface of object. Another aspect of the graphical indicators is that the graphical indicators are not interfered by the other information on the surface when the electronic system reads the graphical indicators.

For the visually negligible feature of graphical indicator, each graphical indicator includes multiple graphical micro-units arranged in a layout. Shown in FIG. 1(A), which has scale of 2.5:1, the combination 100 of the graphical micro-units in a background to "APPLE" is the matrix consisting of graphical micro-units. The micro-units can be reduced further such that the combination 100 of the graphical micro-units is visually negligible or is viewed as a back-ground material by human eyes.

In practical application, the shape of the graphical micro-units may be regular or irregular shape, such as a round spot. For best result, the graphical micro-unit must be so tiny that only a microscope apparatus can detect it.

When the graphical micro-units are tiny and arranged loosely in the layout, the user easily neglects the combination 100 of graphical micro-units and pays attention to main information, like the word "APPLE" depicted in FIG. 1(A). Next, we explain how to use the graphical indicator to carry information.

The combination 100 of the graphical micro-units consists of multiple graphical indicators arranged in sequence. Each graphical indicator includes multiple state zones for selectively respectively storing the graphical micro-units, wherein each of the state zones displays a state from at least two candidate states.

For example, shown in FIG. 1(B), is an enlarged diagram illustrating one of the graphical indicators in FIG. 1(A). The graphical indicator 11 includes 36 units of state zones 113 in the form of 6 by 6 matrix. Each state zone 113 selectively includes one graphical micro-unit or does not include the graphical micro-unit to represent the first or second state.

When the micro-units in state zone 113 of the first state are assigned value of one and those of the second state are assigned value of zero, a bit matrix form 114 shown in FIG. 1(C) is resulted. Thus, the bit matrix form 114 stores a variety of information as expected or desired. In other word, the user can store desired information based on the combination of different values of the state zones.

Furthermore, the multiple graphical indicators, as well as the graphical micro-units, are arranged in two-dimension matrix forms. Such arrangements of the graphical indicators and the graphical micro-units look homogenous to human eyes. Next, the present invention provides a method for retrieving the individual graphical indicator from the matrix form of the graphical indicators.

Shown in FIG. 1(B), which has scale of 100:1, the graphical indicator 11 includes a header information 111 and a content information 112 arranged in a layout that corresponds to different indicator information. In one embodiment, all header information 111 are identical among different graphical indicators 11. However, for a more comprehensive design, more than one set of header information may be employed as long as each header information within each graphical indicator is capable of distinguishing the corresponding graphical indicator from adjacent graphi-

4

cal indicators and indicating the orientation of the corresponding graphical indicator to the optical device. On the other hand, different value of content information 112 represents different indicator information. Thus, one graphical indicator 11 is read through capturing one header information 111, and the graphical indicator 11 does not interfere with each adjacent graphical indicator 11. However, in another embodiment, the header information 111 in one graphical indicator 11 may be different from that of other graphical indicator 11 as long as the system can use the header information to retrieve the corresponding content information.

FIG. 1(D), which has scale of 120:1, is a schematic diagram illustrating the two-dimensional matrix form in accordance with the present invention. The user first searches the header information 111 and further retrieves the graphical indicator 11 and the corresponding content information 112.

Furthermore, in order to rapidly retrieve the indicator information, the image corresponding to the matrix form of the graphical indicators is rotated and converted into bit matrix form, shown in FIG. 1(F) during the process.

Furthermore, we divide the surface of object into multiple index zones. Each zone corresponds to an index value. The graphical indicator corresponding to identical indicator information is repeatedly arranged in each index zone. The graphical indicator corresponding to different indicator information is repeatedly arranged in different index zones. The system maker of the invention records the corresponding relationship of the indicator information to the index zone in an electronic apparatus. When the electronic apparatus captures an image from a index zone, it can acquire the index value of the zone using the corresponding relationship.

For example, FIG. 1(E), which has scale of 20:1, is an enlarged diagram illustrating the index zones and the graphical indicators in accordance with the present invention. The graphical indicators 11 corresponding to same indicator information are arranged in the index zone 12. The graphical indicators corresponding to different indicator information are respectively arranged in the other index zones.

Other embodiment for the graphical indicators is possible. For example, FIGS. 2(A)-2(C) are the diagrams illustrating other embodiments for the graphical indicators in accordance with the present invention. Shown in FIGS. 2(A)-2(C), a vertical segment represents the first state, and a horizontal segment represents the second state.

Furthermore, FIG. 2(D) is the diagram illustrating other embodiment for the arrangement of the graphical indicators in accordance with the present invention. Different from the matrix arrangement in FIGS. 1(A)-1(F), a cellular arrangement is set forth in FIG. 2(D).

Alternately, different graphical indicators may also be arranged in one index zone as shown in FIG. 2(E). The letters "A", "B", "C", and "D" respectively represent four different graphical indicators corresponding to four different indicator information. These four different graphical indicators are repeatedly arranged in sequence within one index zone, shown in FIG. 2(E).

There are requirements for the graphical indicators being negligible to human eyes. First, each graphical indicator must be tiny and human eyes can not differentiate one graphical indicator from others. Second, according to the size of the graphical micro-unit, the pitch between micro-unit, and the desired visual effect, one should reduce the number of the graphical micro-units used. In this way, the graphical indicators have little influence on the brightness of

US 7,328,845 B2

5

the surface of object. Furthermore, number of graphical micro-units of each graphical indicator is substantially equal to each other, and therefore the graphical indicators look more homogenous to human eyes and become invisible to human eyes.

In a first embodiment, each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

In a second embodiment, each square centimeter of the selected zone includes more than 6000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

The following provides the methods for capturing the graphical indicators by an electronic system without interference with main information on the surface of object.

First, a method utilizing infrared ray and oil ink is illustrated below.

While printing the information on conventional media, a desired color is obtained by combining infrared primary inks: cyan (C), magenta (M), yellow (Y), and black (K). Generally, hue and saturation are obtained by adjusting combination of C, Y, and M, and brightness is obtained by adjusting K.

It is noted that infrared ray has high transmittance for most of C, M, Y primitive color inks, but has low transmittance for most of K color inks. In other words, C, M, Y color inks hardly absorb the infrared ray, but black color ink substantially absorbs the infrared ray. Therefore, infrared ray transmits through most of C, M, Y color inks and displays high brightness after reflecting from a light-coloured object surface under C, M, Y color inks. On the contrary, the surface that is printed in black color ink displays low brightness because of the absorption of the infrared ray by most of black color ink. Thus, when a detector receives an image corresponding to graphical indicators printed in most of black color ink, the image does not interfere with main information printed in most of C, M, Y color inks.

On the other hand, when the main information needs to be printed in black, one type of black color, in the specification we called it Near_K, which hardly absorbs infrared ray, is used to print the main information. Mixing C, M, Y colors under predetermined ratio makes Near_K that displays visual black, such as dark indigo or dark brown. The ratio for mixing C, M, Y colors to obtain Near_K color is well known to the people skilled in the art. Since Near_K is made by C, M, Y color inks, Near_K is transmittable by infrared ray. And, to cooperate with this arrangement, the graphical indicators are printed using K (black) color.

In the above description, the black color is used for an example and, however, it is not a limitation. Other inks that can substantially absorb the infrared ray can be used to print graphical indicators. This approach has advantage of low cost. It is to be noted that any type of oil ink, no matter what color it shows, that could substantially absorb infrared ray, are suitable for the print of graphical indicator and are intended scope of protection of present application. Any types of oil ink, that are transmittable by infrared and are close to black visually, i.e. some oil ink of edibility-class without carbon element, can also be used as Near-K color. Near-K color may act as role of black color of four primitive colors (C,M,YK) while printing the main information over the surface.

6

On the other end, it is known that most oil inks absorb ultra-violent or blue light. That is, they do not produce light in visible spectrum when irradiated by ultra-violet or blue light. However, special type ink, such as fluorescent ink, produces visual image under the irradiation of ultra-violet or blue light. Thus, under this approach, the graphical indicators are printed in fluorescent ink, and the main information is printed in a typical oil ink. To cope with the arrangement, ultra-violent or blue light is used to irradiate the surface of object while reading the image. Afterwards, the non-interference image can be obtained by implementing an optical filter for filtering out unwanted spectrum portion.

Another method is to directly use visual light. Since there are many graphical indicators that are not overlapped with the main information, as long as the detector detects single graphical indicator, the indicator information can be obtained.

There are more than one approach to generate (prepare) the indicator information. For example, the additional information is encoded into the indicator information by method of compressed encoding. When the electronic system retrieves the indicator information, it acquires the additional information by decoding the indicator information. When this approach is adopted, the processing device of the invention, responsive to the graphical indicators, acquires the corresponding additional information by processing (decoding) the graphical indicators.

Another way to obtain the additional information from the indicator information is using a mapping unit stored in the electronic system. The embodiments of the mapping unit include a database or a lookup table, etc. Actual implementations for the mapping unit include a hard disk, a floppy disk, a compact disk, a read-only memory, or a memory card. The electronic system acquires the additional information corresponding to the indicator information through the mapping unit. When this approach is adopted, the processing device, responsive to the graphical indicators, acquires the corresponding additional information by transforming the graphical indicators. Furthermore, for a more complicated design, the processing device, responsive to the graphical indicators, acquires the corresponding additional information by processing and/or transforming the graphical indicators.

Exemplary Electronic System Utilizing the Graphical Indicators

FIG. 3 is a schematic diagram illustrating an electronic system 31 in accordance with the present invention. The electronic system 31 includes an optical device 311, i.e. an image acquiring device, a processing device 312, i.e. an image-processing circuit, and an output device 313, i.e. an output circuit. The processing device 312 is wired or wireless coupled to the optical device 311. Similarly, the processing device 312 is wired or wireless coupled to the output device 313.

FIG. 4 is a schematic flowchart illustrating the operation of the electronic system in accordance with the present invention. The optical device 311 captures an image from the surface of object (step 41) that includes the graphical indicator. Next, the processing device 312 retrieves the graphical indicator from the image (step 42) and acquires the additional information corresponding to the graphical indicator (step 43). The output device 313 receives the additional information from the processing device 312 and outputs the additional information (step 44).

FIG. 5 is an embodiment of the processing system in accordance with the present invention. The main informa-

US 7,328,845 B2

7

8

tion is printed on the surface of an object **51**. The main information in the embodiment includes multiple icons **511** and corresponding illustrations **513**. Such main information is generally used in a typical language-learning book or children-teaching book. The object is made of plastic, paper, or any printable carriers.

In addition, the surface of object **51** includes multiple index zones on which respective icons **511** and illustrations **513** are affixed. In particular, the index zone corresponding to the icon **511** is printed with multiple identical graphical indicators **512**. To illustrate clearly, the graphical indicator **512** is visible. But in actual practice, the graphical indicator **512** may be so tiny as to be non-visible to human naked eyes.

In this embodiment, the icon **511** is directly captured by human eyes **52**. In addition, the electronic system **31** is used to acquire the additional information corresponding to the graphical indicator **512**.

As the electronic system **31** is directed to a zone to that the graphical indicator **512** is affixed, the optical device **311** captures the image including the graphical indicator **512** and transfers the image to the processing device **312**. Then the processing device **312** retrieves the graphical indicator **512** from the image and acquires the additional information corresponding to the graphical indicator **512**. In the embodiment, the additional information includes audio information, such as pronunciations of horse in English or other visual information, such as illustration of horse. Then the output device **313** outputs the audio information with a speaker **3131** and the visual information with a display panel **3132**. In addition, other types of information sensible by human being, such as olfactory or tactual information, can also be outputted.

FIG. **6** is a schematic diagram illustrating details of the electronic apparatus in accordance with the present invention. In the embodiment, the electronic apparatus includes an optical-reading device **61**, an image-processing circuit **62**, and an output circuit **63**. The optical-reading device **61** includes one or more sensor units **611** and one or more active light source **612**. The exemplary sensor unit **611** includes sensor micro-units, such as charge couple devices (CCD) or CMOS sensor units. In the embodiment, the image-processing circuit **62** includes a digital signal processor **621** (DSP) and a read-only memory card (ROM card) **622**. The read-only memory card (ROM card) **622** functions as a mapping unit.

FIG. **6** and FIG. **7** together illustrate the operation of embodiment. FIG. **7** is a schematic flow chart illustrating the operation of the electronic apparatus in FIG. **6**. The active light source **612** of the optical-reading device **61** irradiates active light beam **613** onto the surface of object **64** (step **71**). The surface of object **64** absorbs the portion of the active light beam **613** and reflects or scatters the light. The sensor unit **611** captures the scattered light **614** through subsequent lens **615** and an optic filter **616** to form an image (step **72**) and converts the image into electronic information (step **73**).

The sensor unit **611** transfers the electronic information to the image-processing circuit **62** for image processing purpose. The image-processing circuit **62** extracts the combination of the graphical micro-units from the electronic information (step **74**). The exemplary combination of the graphical micro-units is denoted as **100** in FIGS. **1**(A) to **1**(E). Next, the image-processing circuit **62** converts the combination of the graphical micro-units into the numeral codes (step **75**). For example, the combination of the graphical micro-units in FIG. **1**(B) converts into the bit array **65** shown in FIG. **1**(C). Then the image-processing circuit **62** retrieves the indicator information according to the numeral

codes (step **76**) and further acquires the additional information corresponding to the indicator information (step **77**). In the embodiment, the ROM card **622** stores the mapping relationship of the indicator information and the additional information. The digital signal processor **621** executes the image process above-mentioned.

Next, the output circuit **63** outputs the additional information (step **78**). In the embodiment, the additional information is audio information. The output circuit **63** includes a speaker that outputs the audio information corresponding to the zone on the surface of object irradiated by the active light source **612**.

Alternatively, the read-only memory card (ROM card) **622** per se includes a built-in digital signal processor. Under this arrangement, the mapping unit, i.e. read-only memory card (ROM card) **622**, retrieves additional information corresponding to the indicator information responsive to the command from digital signal processor **621**.

FIG. **8** is a schematic diagram illustrating one practical application in accordance with the present invention. In the embodiment, the optical device includes an input pen **81**. The processing device is embedded in a general-purpose computer **82** and is programmable. The output device includes a monitor **831** and a speaker **832**. The book **80** has the graphical indicators of the present invention at predetermined locations, and a disc **821** is accompanied with the book **80**. When the user directs the input pen **81** to the selected zone of the book **80**, such as zone at which "BOOK" is printed, the optical device of the input pen **81** captures the image of the selected zone and transfers it to the general-purpose computer **82** run by the program in the disc **821**. The general-purpose computer **82** processes the image and acquires the additional information under control of the disc **821**, and retrieves the additional information. The additional information includes the explanation of the graphical indicators retrieved and the audio information. Next, the monitor **831** coupled to the general-purpose computer **82** outputs an illustration **834**, as well as the speaker **832** outputs the audio information.

Furthermore, the additional information may also include commands for controlling other interactive devices.

Application for Input of Information

FIG. **9** is a schematic diagram illustrating the additional information used for controlling a responsive device in accordance with the present invention. The surface of object **90** includes multiple index zones, and each index zone has one main information **9011**, such as alphanumeric information on a conventional key cap. Furthermore, one desired graphical indicator **9012** is affixed to the same index zone.

The optical device of an electronic system **91** captures the image including the graphical indicator **9012**. The processing device of the electronic system **91** retrieves the graphical indicator **9012** from the image and acquires the additional information corresponding to the graphical indicator **9012**. The additional information is a command corresponding to the main information **9011**. The electronic system **91** transfers the command to a response device **92**. For instance, the response device **92** may be an audio device capable of generating sound of corresponding piano key. Under the same concept while altering the patterns, the object **90** may easily become a computer keyboard or calculator keyboard. The response device **92** may include mobile phone, personal digital assistant, notebook, and other electronic devices.

FIG. **10** is a schematic diagram illustrating the application of the present invention to information appliances. An interactive television **101** is equipped with a set top box **1011**

US 7,328,845 B2

9

for receiving user-interactive commands. A brochure **103** provided by cable TV program supplier is designed to include the graphical indicator of the invention. When the user selects one program **104** with an input device within the remote selector **102**, the input device retrieves the graphical indicator from the image of the program **104** and acquires the additional information corresponding to the graphical indicator. In the embodiment, the additional information is a command to the set top box **1011**. The output device in the remote selector **102** is an infrared emitter for transferring the command to the set top box **1011**. Thus, the present invention provides an input solution for the interactive television **101**.

Application for Control Function

Besides visual, olfactory or vibrating effects, the additional information includes controlling commands. FIG. **11** is a schematic diagram illustrating the additional information used to control other devices. As indicated, a response device **1001** includes puppets **10011**, **10012**, **10013**, word-line display panel **10014**, and display panel **10015**. A script book **10018** is provided to include the graphical indicators corresponding to the contents. The user selects the specific content with the electronic device **10016**. For example, if the user would like to have a sunny day displayed in the display panel **10015**, he or she captures the corresponding graphical indicator on the script book **10018** using the electronic device **10016**. The electronic device **10016** retrieves the graphical indicator and acquires the corresponding additional information. The additional information is the command **10017** transmitted for controlling the response device **1001**. The electronic device **10016** transfers the command **10017** to the response device **1001** through wireless or infrared transmission. The response device **1001** displays the sunny day on the display panel **10015** in response to the command **10017**.

As the electronic device **10016** is denoted to a dialogue **10019**, the electronic device **10016** retrieves the graphical indicators corresponding to the dialogue **10019** and then acquires a command of additional information. The electronic device **10016** transfers the command to the response device **1001** and the puppet **10012**. The response device **1001** displays the dialogue **10019** on the word-line display panel **10014**, and the puppet **10012** speaks dialogue when making the action.

Substitute for Bar Code

The feature of the present invention is different from conventional bar code. FIG. **12**(A) is a graph illustrating the conventional bar code **10001** in the prior art. FIG. **12**(B) is a graph illustrating use of indicators **10002**, **10003** of the present invention. In one embodiment, the information implicitly stored in the conventional bar code **10001** is now stored in the graphical indicator **10002** provided by the invention, and the information of an editor or a writer is stored in the graphical indicator **10003** provided by the invention. The graphical indicators **10002**, **10003** do not interfere with other main information on the surface **10000**.

Application for Coordinate Positioning System

This invention may be implemented into a coordinate positioning system as index value mentioned above is a coordinate value when a coordinate system is predefined over the surface. Under this application, the coordinate positioning system allows a user to make positioning action over a surface of an object while the surface including a main information. The coordinate positioning system includes a coordinate system and a device.

10

The coordinate system, implemented over the surface, includes multiple coordinate zones. Each coordinate zone includes at least a visually negligible graphical indicator, and the graphical indicator includes multiple graphical micro-units co-existing with the main information over the surface without interference with the main information. The multiple graphical micro-units are arranged in a layout in the graphical indicator, the layout corresponds to an indicator information indicating a coordinate value of each coordinate zone. The device is used for capturing the layout from the graphical indicator, retrieving the coordinate value responsive to the layout, and providing a response in response to the coordinate value.

Those skilled in the art will readily observe that numerous modifications and alterations of the device may be made while retaining the teaching of the invention. Accordingly, the above disclosure should be construed as limited only by the metes and bounds of the appended claims.

What is claimed is:

**1**. A processing system comprising:

an optical device for capturing an image from a selected zone on a surface of an object by a user, wherein the image includes a graphical indicator that is visually negligible and is affixed on the surface of the object;

a processing device coupled to the optical device for receiving the image, the processing device retrieving the graphical indicator from the image and acquiring an additional information corresponding to the graphical indicator by processing and/or transforming the graphical indicators; and

an output device coupled to the processing device for outputting the additional information.

**2**. The processing system of claim **1**, wherein the graphical indicator comprises a plurality of graphical micro-units arranged in a layout, the layout corresponds to an indicator information, the processing device analyses the layout of the graphical micro-units to retrieve the indicator information and further to acquire the additional information from the indicator information by processing and/or transforming graphical indicators.

**3**. The processing system of claim **2**, wherein each graphical indicator occupies very small amount of area, and each graphical micro-unit occupies very small amount of area, and number of graphical micro-units of each graphical indicator is substantially equal to each other.

**4**. The processing system of claim **2**, wherein the surface of the object comprises a main information that overlaps and co-exists with the graphical micro-units on the surface of the object, wherein the graphical micro-units are negligible when the user observes the main information.

**5**. The processing system of claim **4**, wherein the graphical indicator comprises a plurality of state zones for selectively respectively storing the graphical micro-units, wherein each of the state zones displays a state from at least two candidate states.

**6**. The processing system of claim **5**, wherein the candidate states comprise a first state and a second state, as in the first state, the state zone includes one graphical micro-unit, and as in the second state, the state zone does not include the graphical micro-unit.

**7**. The processing system of claim **6**, wherein each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

**8**. The processing system of claim **6**, wherein each square centimeter of the selected zone includes more than 6000

11

state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

9. The processing system of claim 6, wherein the state zones are arranged in a two-dimensional matrix form and the graphical indicator comprises a header information and a content information, each header information within each graphical indicator is capable of distinguishing the corresponding graphical indicator from adjacent graphical indicators and indicating the orientation of the corresponding graphical indicator to the optical device.

10. The processing system of claim 4, wherein each graphical micro-unit is printed in an ink that substantially absorbs infrared ray, and the main information is printed in an ink that hardly absorbs infrared ray, and the optical device emits infrared ray onto the surface of the object and then receives a response image from the surface of the object as the image.

11. The processing system of claim 10, wherein the ink is a black oil ink, while the main information is printed in a Near-K ink that hardly absorb infrared ray.

12. The processing system of claim 4, wherein each graphical micro-unit is printed in a fluorescent ink, and the main information is printed in a typical oil ink, the optical device emitting ultraviolet ray or blue ray onto the surface of the object and then receiving a response image from the surface of the object as the image.

13. The processing system of claim 4, wherein the surface of the object comprises multiple index zones, each index zone corresponds to one index value, and multiple identical graphical indicators are arranged in each index zone.

14. The processing system of claim 1 further comprising a mapping unit indicating mapping relationship of the indicator information and the additional information, the processing device being coupled to the mapping unit to retrieve one additional information corresponding to the indicator information.

15. The processing system of claim 1, wherein the additional information comprises a multi-media information, and the output device outputs the multi-media information to the user.

16. The processing system of claim 1, wherein the graphical indicator is recorded in a vehicle that is affixed onto the surface of the object.

17. The processing system of claim 1 further comprising a mapping unit indicating mapping relationship of the indicator information and the additional information, the mapping unit retrieves one additional information corresponding to the indicator information.

18. A processing system comprising:

a surface of an object including multiple index zones, multiple visually negligible graphical indicators are arranged in each index zone; and

an electronic system comprising an optical device for capturing a selected zone on the surface of the object by a user, the optical device capturing an image from the selected zone, the electronic system retrieving the graphical indicators from the image and producing a response by using an additional information corresponding to one graphic indicator.

19. The processing system of claim 18, wherein each graphical indicator comprises a plurality of graphical micro-units arranged in a layout, the layout corresponds to an indicator information, the processing device analyses the layout of the graphical micro-units to retrieve the indicator information and further to acquire the additional information

12

from the indicator information by processing and/or transforming the indicator information.

20. The processing system of claim 19, wherein the surface of the object comprises a main information that overlaps and co-exists with the graphical micro-units on the surface of the object, wherein the graphical micro-units are negligible when the user observes the main information.

21. The processing system of claim 20, wherein each graphical indicators comprises a plurality of state zones for selectively respectively storing the graphical micro-units, and each state zone displays a state from at least two candidate states.

22. The processing system of claim 21, wherein each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

23. The processing system of claim 21, wherein each square centimeter of the selected zone includes more than 6000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

24. The processing system of claim 21, wherein the candidate states comprise a first state and a second state, as in the first state, the state zone includes one graphical micro-unit, and as in the second state, the state zone does not include the graphical micro-unit.

25. The processing system of claim 24, wherein the state zones are arranged in a two-dimensional matrix form and the graphical indicator comprises a header information and a content information, each header information within each graphical indicator is capable of distinguishing the corresponding graphical indicator from adjacent graphical indicators and indicating the orientation of the corresponding graphical indicator to the optical device.

26. The processing system of claim 20, wherein each graphical micro-unit is printed in an ink that substantially absorbs infrared ray, and the main information is printed in an ink that hardly absorbs infrared ray, and the optical device emits infrared ray onto the surface of the object and then receives a response image from the surface of the object as the image.

27. The processing system of claim 26, wherein the ink is a black oil ink, while the main information is printed in a Near-K ink that comprises an ink hardly absorbing infrared ray.

28. The processing system of claim 20, wherein each graphical micro-unit is printed in a fluorescent ink, and the main information is printed in a typical oil ink, the optical device emitting ultraviolet ray or blue ray onto the surface of the object and then receiving a response image from the surface of the object as the image.

29. The processing system of claim 18, wherein each graphical indicator occupies very small amount of area, and each graphical micro-unit occupies very small amount of area, and number of graphical micro-units of each graphical indicator is substantially equal to each other.

30. The processing system of claim 18, wherein the surface of the object comprises multiple index zones, each index zone corresponds to one index value, and multiple identical graphical indicators are arranged in each index zone.

31. The processing system of claim 18, wherein the response comprises outputting the additional information to the user.

US 7,328,845 B2

13

**32.** The processing system of claim **18** further comprising a response system for receiving the additional information to implement the response.

**33.** An electronic apparatus comprising:

an optical-reading device for capturing an image from a selected zone on a surface of an object by a user, emitting infrared ray to the surface of the object, and then receiving a response image from the surface of the object as the image, the image comprising a graphical indicator that is visually negligible and is affixed onto the surface of the object, the graphical indicator comprising a plurality of state zones for selectively respectively storing a plurality of graphical micro-units, and each state zone displaying a state from at least two candidate states;

an image-processing circuit coupled to the optical-reading device and used to retrieve the image from the graphical indicator and acquire an additional information corresponding to the graphical indicator; and

an output circuit being coupled to the image-processing circuit and outputting the additional information;

wherein the surface of the object comprises multiple index zones, each index zone corresponds to one index value, and multiple identical graphical indicators are arranged

in each index zone, the surface of the object further comprises a main information that overlaps and co-exists with the graphical micro-units on the surface of the object, and the graphical micro-units are negligible when the user observes the main information, and each graphical micro-unit is printed in an ink that substantially absorbs infrared ray, and the main information is printed in an ink that hardly absorbs infrared ray.

**34.** The electronic apparatus of claim **33**, wherein the candidate states comprise a first state and a second state, as in the first state, the state zone includes one graphical micro-unit, and as in the second state, the state zone does not include the graphical micro-unit.

**35.** The electronic apparatus of claim **34**, wherein the state zones are arranged in a two-dimensional matrix form and the graphical indicator comprises a header information and a content information, each header information within each graphical indicator is capable of distinguishing the corresponding graphical indicator from adjacent graphical indicators and indicating the orientation of the corresponding graphical indicator to the optical device.

**36.** The electronic apparatus of claim **35**, wherein the ink is a black oil ink, while the main information is printed in a Near-K ink that comprises an ink hardly absorbing infrared ray.

**37.** The electronic apparatus of claim **36**, further comprising a mapping unit indicating mapping relationship of the indicator information and the additional information, the image-processing circuit being coupled to the mapping unit to retrieve one additional information corresponding to the indicator information.

**38.** The electronic apparatus of claim **36** further comprising a mapping unit indicating mapping relationship of the indicator information and the additional information, the mapping unit retrieves one additional information corresponding to the indicator information.

**39.** The electronic apparatus of claim **33**, wherein the additional information comprises a multi-media information and the output circuit outputs the multi-media to the user.

**40.** The electronic apparatus of claim **33**, wherein the graphical indicator is recorded in a vehicle that is affixed onto the surface of the object.

14

**41.** A memory vehicle comprising: an indicator information;

an additional information; and

mapping relationship of the indicator information and the additional information;

wherein the indicator information corresponds to a graphical indicator that comprises a plurality of state zones for selectively respectively storing a plurality of graphical micro-units, each state zone displays a state from at least two candidate states, a surface of an object comprises multiple index zones, each index zone corresponds to one index value, and multiple identical graphical indicators are arranged in each index zone, and the surface of the object further comprises main information that overlaps and coexists with the graphical micro-units that are negligible when a user observes the main information.

**42.** An image-processing circuit comprising:

a digital-signal-processing chip coupled to a memory vehicle and used for capturing a graphical indicator from an image and retrieving additional information corresponding to the graphical indicator;

wherein the graphical indicator comprises a plurality of state zones for selectively respectively storing a plurality of graphical micro-units, and each state zone displays a state from at least two candidate states, and the digital-signal-processing chip analyzes a layout of the graphical micro-units to retrieve the plurality of indicator information and further to acquire the additional information by processing and/or transforming the indicator information.

**43.** A coordinate positioning system allowing a user to make positioning action over a surface of an object, said surface including a main information, comprising:

a coordinate system, implemented over said surface, including multiple coordinate zones, each coordinate zone including at least a visually negligible graphical indicator, said graphical indicator including multiple graphical micro-units co-existing with the main information over the surface without interference with the main information, multiple graphical micro-units being arranged in a layout in the graphical indicator, the layout corresponding to an indicator information indicating a coordinate value of each coordinate zone; and

a device for capturing the layout from the graphical indicator, retrieving the coordinate value responsive to said layout, and providing a response in response to the coordinate value.

**44.** The coordinate positioning system of claim **43**, wherein the graphical indicator comprises a plurality of state zones for selectively respectively storing the graphical micro-units, wherein each of the state zones displays a state from at least two candidate states, combination of states in each graphical indicator is different from combination of states in one different graphical indicator.

**45.** The coordinate positioning system of claim **44**, wherein the candidate states comprise a first state and a second state, as in the first state, the state zone includes one graphical micro-unit, and as in the second state, the state zone does not include the graphical micro-unit.

**46.** The coordinate positioning system of claim **45**, wherein the state zones are arranged in a two-dimensional matrix form and the graphical indicator comprises a header information and a content information, each header information within each graphical indicator is capable of distinguishing the corresponding graphical indicator from adjacent graphical indicators and indicating the orientation of the corresponding graphical indicator to the optical device.

US 7,328,845 B2

15

**47**. The coordinate positioning system of claim **46**, wherein each graphical micro-unit is printed in an ink that substantially absorbs infrared ray, and the main information is printed in an ink that hardly absorbs infrared ray, and the optical device emits infrared ray onto the surface of the object and then receives a response image from the surface of the object as the image.

**48**. The coordinate positioning system of claim **47**, wherein the ink is a black oil ink, while the main information is printed in a Near-K ink that hardly absorb infrared ray.

**49**. The coordinate positioning system of claim **47** wherein each graphical micro-unit is printed in a fluorescent ink, and the main information is printed in a typical oil ink, the optical device emitting ultraviolet ray or blue ray onto

16

the surface of the object and then receiving a response image from the surface of the object as the image.

**50**. The coordinate positioning of claim **45**, wherein each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

**51**. The coordinate positioning of claim **45**, wherein each square centimeter of the selected zone includes more than 6000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

* * * * *

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8776th)
# United States Patent
Tsai

(10) **Number:** **US 7,328,845 C1**
(45) **Certificate Issued:** **Dec. 27, 2011**

(54) **METHOD FOR PRODUCING INDICATORS AND PROCESSING APPARATUS AND SYSTEM UTILIZING THE INDICATORS**

(75) Inventor: **Yao-Hung Tsai**, Taipei (TW)

(73) Assignee: **Sonix Technology Co., Ltd.**, Chupei, Hsinchu (TW)

**Reexamination Request:**
No. 90/011,446, Jan. 19, 2011

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **7,328,845** |
| Issued: | **Feb. 12, 2008** |
| Appl. No.: | **10/189,244** |
| Filed: | **Jul. 2, 2002** |

(30)     **Foreign Application Priority Data**

Jan. 11, 2002    (TW) ........................................ 91100350 A

(51) **Int. Cl.**
*G06K 7/10*     (2006.01)
*G06K 7/14*     (2006.01)

(52) **U.S. Cl.** ...................................... **235/454**; 235/435

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56)     **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,446, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Robert Nasser

(57)     **ABSTRACT**

The present invention discloses a method for producing graphical indicators and interactive systems for utilizing the graphical indicators. On the surface of an object, visually negligible graphical indicators are provided. The graphical indicators and main information, i.e. text or pictures, co-exist on the surface of object. The graphical indicators do not interfere with the main information when the perception of human eyes are concerned. With the graphical indicators, further information other than the main information on the surface of object are carried. In addition to the main information on the surface of object, one is able to obtain additional information through an auxiliary electronic device or trigger an interactive operation.



US 7,328,845 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **9**, **15**, **25**, **35-39** and **46-49** is confirmed.

Claims **1-8**, **10-14**, **16-24**, **26-34**, **40-45**, **50**, and **51** are cancelled.

New claims **52-90** are added and determined to be patentable.

*52. A processing system comprising:*

*an optical device for capturing an image from a selected zone on a surface of an object by a user, wherein the image includes a graphical indicator that is visually negligible and is affixed on the surface of the object, and the graphical indicator comprises header information and content information; a processing device coupled to the optical device for receiving the image, the processing device retrieving the graphical indicator from the image and acquiring an additional information corresponding to the graphical indicator by processing and/or transforming the graphical indicator; and an output device coupled to the processing device for outputting the additional information.*

*53. The processing system of claim 52, wherein the header information within the graphical indicator can be used to distinguish the corresponding graphical indicator from adjacent graphical indicators.*

*54. The processing system of claim 53, wherein the header information within the graphical indicator can be used to determine the orientation of the corresponding graphical indicator with respect to the optical device.*

*55. The processing system of claim 52, wherein the graphical indicator comprises a plurality of graphical micro-units arranged in a layout, the layout corresponds to an indicator information, the processing device analyses the layout of the graphical micro-units to retrieve the indicator information and further to acquire the additional information from the indicator information by processing and/or transforming the graphical indicators.*

*56. The processing system of claim 55, wherein each graphical indicator occupies a very small amount of area, and each graphical micro-unit occupies very small amount of area, and number of graphical micro-units of each graphical indicator is substantially equal to each other.*

*57. The processing system of claim 55, wherein the surface of the object comprises a main information that overlaps and co-exists with the graphical micro-units on the surface of the object, wherein the graphical micro-units are negligible when the user observes the main information.*

*58. The processing system of claim 55, wherein the graphical indicator comprises a plurality of state zones for selectively respectively storing the graphical micro-units,*

**2**

*wherein each of the state zones displays a state from at least two candidate states.*

*59. The processing system of claim 58, wherein the candidate states comprise a first state and a second state, as in the first state, the state zone includes one graphical micro-unit, and as in the second state, the state zone does not include the graphical micro-unit.*

*60. The processing system of claim 59, wherein each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.*

*61. The processing system of claim 59, wherein each square centimeter of the selected zone includes more than 6000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.*

*62. The processing system of claim 58, wherein the state zones are arranged in a two-dimensional matrix form.*

*63. The processing system of claim 55, wherein each graphical micro-unit is printed in an ink substantially absorbs infrared ray, and the main information is printed in an ink that hardly absorbs infrared ray, and the optical device emits infrared ray onto the surface of the object and then receives a response image from the surface of the object as the image.*

*64. The processing system of claim 63, wherein the ink is a black oil ink, while the main information is printed in a Near-K ink that hardly absorb infrared ray.*

*65. The processing system of claim 55, wherein each graphical micro-unit is printed in a fluorescent ink, and the main information is printed in a typical oil ink, the optical device emitting ultraviolet ray or blue ray onto the surface of the object and then receiving a response image from the surface of the object as the image.*

*66. The processing system of claim 55, wherein the surface of the object comprises multiple index zones, each index zone corresponds to one index value, and multiple identical graphical indicators are arranged in each index zone.*

*67. The processing system of claim 52 further comprising a mapping unit indicating mapping relationship of the indicator information and the additional information, the processing device being coupled to the mapping unit to retrieve one additional information corresponding to the indicator information.*

*68. The processing system of claim 52, wherein the additional information comprises a multi-media information, and the output device outputs the multi-media information to the user.*

*69. The processing system of claim 52, wherein the graphical indicator is recorded in a vehicle that is affixed onto the surface of the object.*

*70. The processing system of claim 52, further comprising a mapping unit indicating mapping relationship of the indicator information and the additional information, the mapping unit retrieves one additional information corresponding to the indicator information.*

*71. A processing system comprising:*

*a surface of an object including multiple index zones, wherein a plurality of visually negligible graphical indicators are arranged in the index zones and wherein the graphical indicators comprise header information and content information; and an electronic system comprising an optical device for capturing a selected zone on the surface of the object by a user, the optical device capturing an image from the selected zone, the electronic system retrieving the graphical indicators*

US 7,328,845 C1

3

from the image and producing a response by using an additional information corresponding to one graphical indicator.

72. The processing system of claim 71, wherein the header information within the graphical indicator can be used to distinguish the corresponding graphical indicator from adjacent graphical indicators.

73. The processing system of claim 72, wherein the header information within the graphical indicator can be used to determine the orientation of the corresponding graphical indicator with respect to the optical device.

74. The processing system of claim 71, wherein each graphical indicator comprises a plurality of graphical micro-units arranged in a layout, the layout corresponds to an indicator information, the processing device analyses the layout of the graphical micro-units to retrieve the indicator information and further to acquire the additional information from the indicator information by processing and/or transforming the indicator information.

75. The processing system of claim 74, wherein the surface of the object comprises a main information that overlaps and co-exists with the graphical micro-units on the surface of the object, wherein the graphical micro-units are negligible when the user observes the main information.

76. The processing system of claim 75, wherein each graphical indicators comprises a plurality of state zones for selectively respectively storing the graphical micro-units, and each state zone displays a state from at least two candidate states.

77. The processing system of claim 76, wherein each square centimeter of the selected zone includes more than 3000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

78. The processing system of claim 76, wherein each square centimeter of the selected zone includes more than 6000 state zones of which less than seventy percent are in the first state, and percentage of area occupied by the graphical micro-unit in the state zone is less than 80.

79. The processing system of claim 76, wherein the candidate states comprise a first state and a second state, as in the first state, the state zone includes one graphical micro-unit, and as in the second state, the state zone does not include the graphical micro-unit.

4

80. The processing system of claim 79, wherein the state zones are arranged in a two-dimensional matrix form.

81. The processing system of claim 75, wherein each graphical micro-unit is printed in an ink that substantially absorbs infrared ray, and the main information is printed in an ink that hardly absorbs infrared ray, and the optical device emits infrared ray onto the surface of the object and then receives a response image from the surface of the object as the image.

82. The processing system of claim 81, wherein the ink is a black oil ink, while the main information is printed in a Near-K ink that comprises an ink hardly absorbing infrared ray.

83. The processing system of claim 81, wherein each graphical micro-unit is printed in a fluorescent ink, and the main information is printed in a typical oil ink, the optical device emitting ultraviolet ray or blue ray onto the surface of the object and then receiving a response image from the surface of the object as the image.

84. The processing system of claim 71, wherein each graphical indicator occupies very small amount of area, and each graphical micro-unit occupies very small amount of area, and number of graphical micro-units of each graphical indicator is substantially equal to each other.

85. The processing system of claim 71, wherein the surface of the object comprises multiple index zones, each index zone corresponds to one index value, and multiple identical graphical indicators are arranged in each index zone.

86. The processing system of claim 71, wherein the response comprises outputting the additional information to the user.

87. The processing system of claim 71 further comprising a response system for receiving the additional information to implement the response.

88. The processing system of claim 71, wherein the object is the page of a book.

89. The processing system of claim 75, wherein the main information comprises text and/or images.

90. The processing system of claim 74, wherein the header information comprises a portion of the graphical micro-units.

* * * * *

## (12) EX PARTE REEXAMINATION CERTIFICATE (9459th)

# United States Patent
Tsai

(10) **Number:** US 7,328,845 C2
(45) **Certificate Issued:** Dec. 26, 2012

(54) **METHOD FOR PRODUCING INDICATORS AND PROCESSING APPARATUS AND SYSTEM UTILIZING THE INDICATORS**

(75) Inventor: **Yao-Hung Tsai**, Taipei (TW)

(73) Assignee: **Sonix Technology Co., Ltd.**, Chupei, Hsinchu (TW)

**Reexamination Request:**
No. 90/012,102, Jan. 26, 2012

**Reexamination Certificate for:**
Patent No.: **7,328,845**
Issued: **Feb. 12, 2008**
Appl. No.: **10/189,244**
Filed: **Jul. 2, 2002**

Reexamination Certificate C1 7,328,845 issued Dec. 27, 2011

(51) **Int. Cl.**
 *G06K 7/14* (2006.01)
(52) **U.S. Cl.** ...................................... 235/454; 235/435
(58) **Field of Classification Search** ........................ None
 See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,102, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Dennis Bonshock

(57) **ABSTRACT**

The present invention discloses a method for producing graphical indicators and interactive systems for utilizing the graphical indicators. On the surface of an object, visually negligible graphical indicators are provided. The graphical indicators and main information, i.e. text or pictures, co-exist on the surface of object. The graphical indicators do not interfere with the main information when the perception of human eyes are concerned. With the graphical indicators, further information other than the main information on the surface of object are carried. In addition to the main information on the surface of object, one is able to obtain additional information through an auxiliary electronic device or trigger an interactive operation.



US 7,328,845 C2

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

**2**

The patentability of claims **9**, **25**, **35-38**, **46-49** and **52-90** is confirmed.

Claims **1-8**, **10-14**, **16-24**, **26-34**, **40-45** and **50-51** were previously cancelled.

Claims **15** and **39** are cancelled.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on April 6, 2016 by:

☐    US Mail

☐    Fax

☐    Hand

☒    Electronic Means (by email or CM/ECF)


Jonathan Hangartner                              s/ Jonathan Hangartner
Name of Counsel                                  Signature of Counsel

Law Firm:              X-Patents, APC
Address:               5670 La Jolla Boulevard
City, State, ZIP:      La Jolla, CA 92037
Telephone Number:      858-454-4313
FAX Number:            858-454-4314
E-mail Address:        jon@x-patents.com

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing Brief for Plaintiff-Appellant complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(b). The brief was printed using 14-point Times New Roman font. The word-processing system used to prepare the document, excluding the Table of Contents, Table of Authorities, and Certificate of Interest, calculates that it contains 11,636 words.

/s/Jonathan Hangartner
Jonathan Hangartner